### THOMAS C. SHELDON v. DANIEL MILMO ET AL.

#### Decided June 18, 1896.

1. **Spanish Grant—Title by Governor of Monclova in 1816.**

G., on his petition to the Governor of the Province of Monclova, on Feb. 22, 1816, obtained an order to the Justice of Palafox, a town on the Rio Grande, where he resided, to issue to him a testimonio of title to land which he had occupied and improved, in conformity with which the justice extended to him, April 20, 1816, a grant of the land asked for, which was at that time embraced in the intendencia of San Luis Potosi. The intendencias were established by royal ordinance of Dec. 4, 1786, by article 81, of which the intendentes were given exclusive power over the distribution of the royal lands. By decree of the Cortes, January 4, 1813, distribution of such lands was placed under the control of the ayuntamientos of the respective municipalities with the approval of the provincial deputations. Held:

(1) Such decree of January 4, 1813, so far as it provided for the sale and distribution of vacant lands, was not affected by the royal cedula of August 22, 1814, which placed the proprios of the several municipalities under the jurisdiction of the Kings Council,—annulling the decrees of the Cortes as to that branch of public service,—and restored that administration to the state in which it existed in 1808, at the time the King was deposed by French invasion. The proprios there referred to were the lands set apart for defraying the charges of the municipalities and not the unappropriated royal domain. (Pp. 13, 14.)

(2) The effect of the royal cedula of July 8, 1814, which expressly annulled article 7 of the decree of the Cortes of September 13, 1813, and re-established on the footing in which they were in 1808 the rights awarded to the towns in the baldios or unappropriated royal domain is difficult to determine but the court are of the opinion that it was not its purpose to restore the power of the intendentes over the vacant lands. (Pp. 14, 15, 17.)

(3) While there may have been in 1816 no general law in operation in Mexico for the disposition of the vacant lands, the court find in this legislation no wel.-defined intention to depart from the ancient policy of alienating the lands for the purpose of settling the country,—the matter having been perhaps controlled by special authority issued to the governors of provinces or other officers, regulating each grant of authority according to the exigencies of the particular territory. (P. 17.)

(4) Public acts of public officers purporting to be exercised in an official capacity, and by public authority, will not be presumed to be usurped. The presumption arising from the grant itself makes it prima facie evidence of the power of the officers making it and throws the burden of proof on the party denying it. (U. S. v. Peralto, 19 How., 343: U. S. v. Clarke, 8 Pet., 436; Jones v. Garza, 11 Texas, 386; Hancock v. McKinney, 7 Texas, 384; Holliman v. Peebles, 1 Texas, 699; Jenkins v. Chambers, 9 Texas, 167). (P. 18.)

(5) The powers of a governor of a province in 1816 were not so definitely ascertained that a grant by him in the absence of special authority should be held void when the jurisdiction of the intendentes over vacant land was taken away. (P. 20.)

(6) The continued authority of the intendentes over these grants is not to be inferred from the fact that their approval was neccessary to a grant in West Florida at that time; nor from the fact that in Sabriego v. White, 124 U. S., 261, the intendente of San Luis Potosi is found to have directed a sale of confiscated lands in 1817 in the jurisdiction of Bexar, since the confiscated lands belonged to the royal treasury, the administration and superintendence of which was a peculiar function of the intendente.  (P. 20.)

(7) In view of the obscurity in which the whole matter is involved it should be presumed that the governor who caused the title in controversy in this case to be extended, did not usurp the authority.  (P. 21.)

(8) The grant in question conveyed title to the land to G., without the approval of the intendente.  (Pp. 10 to 22.)

**2.  Protocol—Testimonio—Final Title.**

The terms protocol and testimonio defined, and held, that a written instrument (given at length in the opinion) issued to the grantee as present original evidence of title, though not on stamped paper, which recites that a testimonio is to be issued when stamped paper can be procured, is a final title and should be accepted as such when it was deemed sufficient evidence of right by the officers of the former government.  (Downing v. Diaz, 80 Texas, 436.)  (Pp. 21, 22.)

ERROR to Court of Civil Appeals, Fourth District, in an appeal from Webb County.

The action was trespass to try title, brought by Sheldon against Milmo and others in District Court of Webb County, to recover a tract of land there situated.  Plaintiff claimed under the Spanish grant set out in the opinion of the court; defendants under patents from the State of Texas. The case was tried without a jury, the trial court making special findings of fact and law and holding the grant, under which plaintiff claimed, to be void for want of approval by the intendente of the province.  Defendant thereupon had judgment which was affirmed on appeal.  The facts appear in the opinion.

*J. O. Nicholson,* for defendants in error.—In whomsoever the power to grant the crown lands in the province of Coahuila and Texas, as the King's deputy in the year 1816, was vested, to make a perfect title, it was not only necessary that grantees be put in lawful possession and muniment of title extended them, but it was imperative that such title be confirmed by the officer possessing the power to make the grant. Paschal v. Perez, 7 Texas, 368 to 371; Edwards v. Roark, 19 Texas, 191; Menard's Heirs v. Massey, 8 How., 305-316; Hall's Mexican Laws, pp. 41 and 42, section 4 of section 85.

The document extruded to Manuel Garcia by the Justice of Palafox only conveyed an imperfect or inchoate title which required the further exercise of the granting power to pass the fee in the land; and the same not having been perfected by confirmation under Spanish authority, nor under the laws of the Republic nor State of Texas allowing such claims as might have matured into a perfect title under the laws, usages, and customs under the Spanish government, under which it originated, it has no legal standing under the laws of Texas.  Paschal v. Perez, 7 Texas, 366-371; Paschal v. Dangerfield, 37 Texas, 300-305; Hancock v. McKinney, 7 Texas, 444-452; Menard's Heirs v. Massey, 8 How., 305-

316; Hall's Mexican Law, secs. 24, 25 and 26; Ib. Royal Cedula, 1735, sec. 27; Ib. Royal Cedula, 1754, secs. 28 and 66 to 82; Ib. Laws of the Indies, book 4, title 12, as to sales of lands, etc., chap. 3, pp. 17 to 25; Ib. Ordinance of Intendentes of 1786 sec. 30; Ib. Royal Cedula, March 23, 1798, sec. 87; White's Compilation, pp. 62 to 67, 67 to 71; Regulations and Instructions of Juan Ventura Morales, Intendente and Sub-delegate of the Provinces of Louisiana and West Florida, dated July 17, 1799 (special reference is made to articles 7, 15, 16, 17, 18, 19, 20, 24, 28, 32, and 34); White's Compilation, vol. 2, pp. 234 to 243; Letter of Intendente Morales, dated December 1, 1802, to Don Henry Payreux, showing that the 81st article of the Royal Ordinance for the Intendentes of New Spain must be observed; Ib., vol. 2, p. 245; Decree of January 4, 1813, Hall's Mexican Law, secs. 88 to 108, which was repealed July 8, 1814; Ib., sec. 109.

It will not be presumed that the Justice of Palafox had authority to extend final titles in face of the abundant authority to the contrary. Same authorities. Also, Royal communication under date June 8, 1814, to the Governor of Florida conveying the royal order that the laws of the Indies and the ordinance of the Intendentes respecting the sale of lands should be observed, notwithstanding the decree of the Cortes of January 4, 1813; 2 White's Compilation, pp. 264, 265; Letter of Intendente, General Alexander Morales, of the Island of Cuba and the two Floridas, dated November 17, 1817, to the Surveyor General of West Florida, in which is declared null and void the grants of land made by the Governor of West Florida because of non-compliance with regulations of July 17, 1799, made by the Intendant General; White's Compilations, vol. 2, p. 392.

If the Spanish law, at the time this grant purports to have been made, required that such title papers should be referred back to the Governor or Intendente for approval or confirmations, in order to vest the fee to the lands in Don José Manuel Garcia, then the failure of the Governor and the Justice to make such reference to such other authority for approval or confirmation would not have the effect to vest a perfect and final title in said Garcia.

The instrument relied on by appellant as evidence of a grant to Garcia is neither a protocol nor a testimonio, neither does it purport to be a copy of either, and it shows on its face that it never was an original document or register in any office under the government under which it originated and therefore is not legally an archive in the Land Office of Texas. Smith v. Townsend, Dallam, 570-573; Paschal v. Perez, 7 Texas, 356-360; Herndon v. Casiano, 7 Texas, 332, 333; Revised Statutes of Texas, articles 57 and 2252; White's Compilations, vol. 1, p. 297.

This document shows on its face that it was not on stamped paper for the year in which it purports to have been issued, and was therefore invalid. Jones v. Montes, 15 Texas, 352.

It is a fact judicially known to this court that, in whomsoever was vested the right to extend final and complete title to the vacant crown

lands in the Spanish possessions in America, there existed the same general laws regulating the proceedings through which such a title could be acquired.

These regulations required in substance, 1st.—That a petition be addressed to the proper officer soliciting a concession of land; 2nd.—An indorsement thereon of said officer granting the concession and ordering that a survey be made; 3rd.—A certificate of a surveyor that the land applied for had been surveyed; and 4th.—The application, concession and report of the surveyor, or testimonios thereof were presented to the proper authority for investigation, and if found in accordance with law, the same was approved or confirmed; which act of approval or confirmation constituted the final title; and all these evidences of title were then required to be recorded in several departments. See Hall's Mexican Law, secs. 24, 25 and 26; also Ib., sec. 27; Cedula of 1735, as to confirmation; Ib., sec. 28; Cedula of 1754; also secs. 66 to 82, Ib., chap. 3; Laws of the Indies, book 4, title 12, as to sales of land, etc., 17 to 25; Ib., sec. 30, Ordinances of Intendentes of 1786; Ib., sec. 87, Royal Cedula of March 23, 1798; also Paschal v. Perez, 7 Texas, 366 to 371; Menard's Heirs v. Massey, 8 How., 305 to 316.

In this last case Mr. Justice Catron, delivering the opinion of the court, said: "The necessity of a further title than a mere loose order of survey given by commandants of posts and lieutenant governors, and placed in the hands of the interested party, is too manifest for comment. Petitions were written by the party asking the land, or some one for him; the Governor consented usually by indorsement on the petition and ordered that the petitioner should have the land and directed that it should be surveyed; the paper was handed to the petitioner who might deliver it to the surveyor or omit it; if he presented it and the land was laid off, then it was the duty of the surveyor to record both the concession and the plat, together with the proces verbal. But this did not make the party owner. Without the further act of the King's deputy—the Intendente General—the title still continued in the crown."

In the case at bar there is no evidence that a survey or plat of the land asked for had been made. It is true that the justice at Palafox states that he would proceed to the examination and survey of the same, but he nowhere states that a survey was actually made. It is true he states that he put the applicant in possession of the land, describing it to a certain extent, but certainly the description is not such as would separate it from the public domain, and there the proceedings stop. There is nothing to show that any proces verbal, copy, or other paper of any kind had been returned to any office or officer, or registered in any office of the government. In fact, no record of said grant was preserved by any person representing the government. In view of the rules and regulations of the Spanish government, herein referred to, regarding the granting of the crown lands, and the many adjudicated cases in the courts of the country, are we authorized to presume that

even the justice at Palafox believed that the papers he delivered to Jose Manuel Garcia, evidenced such a title to the land as could not be legally disavowed by the Spanish Government? We think not.

The general rules regulating the granting of the crown lands as hereinbefore stated will be found to be in accordance with the laws of the Indies, the Cedula of 1754 and the Ordinance of the Intendentes; and Mr. Hall, in his work on the Laws of Mexico, sec. 4, sec. 85, pp. 41 and 42, says, that there is nothing to show that any of the above laws were repealed, and that "they must therefore be considered as having been in force up to the independence of Mexico, except so far as the one subsequent in date repealed that which was prior in date and in conflict therewith." See also general regulations of Intendent Juan Ventura Morales of the provinces of Louisiana and West Florida, dated July 17th, 1799, p. 234, vol. 2 of White's Compilation, wherein he says that the regulations of 1754 and the 81st article of the Ordinance of the Intendants are to be observed. See, also, of the said regulations, articles 15, 16, 17 and 18, on pp. 238 and 239. See, also the royal order to the Governor of Florida, dated June 8, 1814, vol. 2, White's Compilation, pp. 264 and 265, wherein reference is made to the "decree of the 4th of January, of last year, relative to the distribution of lands," and wherein it is required that the laws of the Indies and the ordinances of intendants be observed. From the language of this order it is evident that the King was referring to the decree of the Cortes of January 4, 1813, which is cited by appellant in support of his first proposition under his second assignment of error, and from the language of said order it is further evident that the Governor of Florida had fallen into the same error in regard to said decree of January 4, 1813, as the eminent counsel for appellant are laboring under in this case.

It will be seen also that this royal order is subsequent in date to all the decrees, manifestos and circulars except the last two, cited by appellant in support of his said proposition. The decree of January 4, 1813, is set out in full in Hall's Mexican Laws, secs. 88 to 108, and we confess that we are unable to see wherein it undertakes to change the regulations regarding the sale of the crown lands as laid down in the laws of the Indies, the Cedula of 1754, and the Ordinances of the Intendants. Hall, in section 109 of his said work, says, that this decree was abrogated by a Royal Cedula of the 8th July, 1814. See, also, the opinion of Chief Justice Marshall in the case of the U. S. v. Clarke, 8 Pet., 451 to 460.

We however contend that the lands involved in this suit were at the time of the alleged grant within the jurisdiction of the Intendency of San Luis Potosi, and that there could not be a final title vesting the fee to the land in Garcia without the confirmation of the Intendant at San Luis Potosi.

We presume that it will be admitted that if the said Intendency was still in existence, then we are correct in the above assertion. Was the said Intendency in existence at said date? Appellant contends that it

was not. We contend that it was, and base our views upon the following authorities, viz.: Royal order to the Governor of Florida, under date of June 8, 1814, heretofore cited; wherein, among other things, the King says he "has been pleased to command that the Intendant comply exactly with what is directed in said ordinances respecting the alienation of lands;" Vol. 2, White's Compilation, p. 264; also Act of accord between the Captain General and Intendant of Cuba declaring their joint jurisdiction over the department of Royal domain in the Floridas, under date August 9th, 1816; Vol. 2, p. 186, White's Compilation; also, Letter of Intendant, Alexander Morales, dated November 17, 1817, to Don Sebastian Pintado, Surveyor General of West Florida; Ib., vol. 2, p. 392, wherein he, among other things, says he incloses a copy of a letter which he had that day written to the Commandant of West Florida, informing him, said Commandant, that, "I cannot forbear declaring, as from henceforth I do declare, null and without effect all those concessions which may have been made in your province from the 3d of July of the year last past, in which I took possession of this Intendency" "The office of Intendente broken up in 1818 by change of government;" Paschal v. Dangerfield, 37 Texas, 295. In Bancroft's History of Texas, vol. 1, p. 605, we find that in 1776 Coahuila and Texas belonged to the Provincias Internas, and that in 1786 they were attached to the Intendencia of San Louis Potosi; also, that the province of Coahuila, also called Reina de la Nueva Extremadura, extended northward across the Rio Bravo to the Rio Medina, which was generally regarded as the boundary between that province and Texas, known also as Nuevas Filipinas, Ib., pp. 603 and 604, and note 2 on p. 604.

In Bancroft's History of Mexico, vol. 3, p. 455, we find that in 1804, and from that time to the end of Spanish domination, the country was divided into twelve Intendencias, to wit: Sonora and Sinaloa, Durango, Zacatecas, Guadalajara, San Luis Potosi, Gunajuato, Valladolid, Mexico, Puebla, Vera Cruz and Merida. Also, Ib., Vol. 3, pp. 481 and 482, we find that Viceroy Revilla Gigedo established archives. His reign commenced in 1789 and ended in 1794. The Intendencias established by his predecessor continued during his administration except that he ordered the Intendencia of San Luis Potosi to comprise the Territories of Coahuila and Texas.

This court then judicially knows as a historical fact that the lands involved in this suit were in February, 1816, the date of the alleged grant, within the jurisdiction of the Intendency of San Luis Potosi, and that at said date such Intendency was in existence; and, in addition, such fact has been judicially ascertained by this court in the case of Paschal v. Dangerfield, 37 Texas, 395. We therefore submit that, as the record shows that no confirmation of the said grant has ever been made by the Intendant at San Luis Potosi, the same is an imperfect title; and as there was not sufficient possession of the land proven, to

authorize the presumption of a confirmation of the grant, the judgment should be affirmed.

*J. C. Nicholson,* for defendants in error, filed motion for rehearing, upon the grounds following:

First. That this court erred in holding that the royal decree of July 8, 1814, "did not have the effect to repeal the decree of January 4, 1813, to such an extent as to restore the jurisdiction of the Intendents over the vacant lands."

Second. The court erred in its conclusions to the effect that there was no general law for the disposition of vacant lands in force in Mexico from the date of the decree of January 4, 1813, until after the independence of Mexico.

Third. The court erred in holding that the province of Coahuila and Texas, or rather, that the territory which included the lands in controversy in this suit was at the date of the alleged grant a "distant province."

Fourth. The court erred in holding that the authority of the Governor to make the alleged grant in question, must be presumed.

Fifth. The court erred in holding that the paper evidence of the alleged grant was sufficient to show the extension of a final title.

In support of the motion, counsel filed a printed argument and citation of authorities.

*Bethal Coopwood* and *W. M. Walton,* for plaintiff in error.—The Intendente's power to adjudicate and confirm final titles to land was taken away by the constitution and laws of the Cortes prior to the issuance of the grant to Garcia, which, therefore, makes no reference to such authority, and the power to perform such duties according to the law of Intendente's was vested in the governor's and their Alcaldes Muyores, who extended titles in perfect dominion.    Constitution of the Cortes, title 5, chapter 1, and title 6, chapters 1 and 2; Legislacion Mexicana, Coleccion Completa, Ordenada por los Licenciados Dublan and Lozano, Edicion Oficial, vol. 1, pp. 369, et seq.; Decree of 9th of October, 1812, Dublan and Lozano, vol. 1, pp. 397, et seq.; Decree of 4th of January, 1813, Dublan and Lozano, vol. 1, pp. 397, et seq.; Eschriche Mexicano, New Edicion, Verbo Intendente; Decree of 13th of September, 1813, Manifiesto del Rey of 4th of May, 1814, Decretos del Rey, vol. 1, pp. 1 to 8; Decree of Valencia 4th of May, 1814, Decretos del Rey, vol. 1, p. 13; Circular of 16th of May, 1814, Decretos del Rey, vol. 1, pp. 15-17; also that of 18th of May, 1814, Id., p. 18; Circular of 21st of May, 1814, Decretos del Rey, vol. 1, pp. 19 and 20; Circulars of 24th of May, 1814, Decretos de Rey, pp. 30 and 32; Royal Cedula of 28th of December, 1814, Decretos del Rey, vol. 1, pp. 424 to 427; Decree of March 20, April 17, 1820, Dublan and Lozano, vol. 1, pp. 511 and 514; U. S. v. Acosta, 1 How, 26.

The governor, as the King's deputy, was the sole judge of the merits

of Garcia on which his claim was founded, and had undoubted power to reward the merits of the grantee; and the grant by the governor, authorized to grant lands in his province, is prima facie evidence that his power is not exceeded; and the connection between the Crown and the Governor justifies the presumption that he acts according to his orders which are known to himself and to those from whom they proceed, but may not be known to the world; and no excess of his powers, or departure from them is to be presumed; and in view of the course pursued by the Governor of the province and other officers who must be presumed to have understood their powers and in good faith acted upon them, nothing short of a law clearly showing a usurpation of power would justify the courts in holding that their acts were invalid. U. S. v. Acosta, 1 How., 26; U. S. v. Clark, 8 Pet., 451; Delassus v. U. S., 9 Pet., 134; Railway v. Locke, 74 Texas, 402; Hancock v. McKinney, 7 Texas, 453-454; U. S. v. Arredondo, 6 Pet., 691; Jones v. Garza, 11 Texas, 207; Jenkins v. Chambers, 9 Texas, 232-233; Houston v. Perry, 3 Texas, 395; Les Bois v. Bramell, 4 How., 449; Strother v. Lucas, 12 Pet., 437-438; U. S. v. Peralta, 19 How., 347.

When the act done by the Governor is contrary to the written order of the King, produced at the trial, without any explanation, it should be presumed that the power has not been exceeded that the act was done on the motive set out therein, and according to some order known to the King and his officers, though not to his subjects; and courts ought to require very full proof, that he has transcended his powers, before they so decide; and the burden of making such proof was upon the appellees in this case. Strother v. Lucas, 12 Pet., 438; Clark v. Hills et al., 67 Texas, 144; Johns v. Schutz, 47 Texas, 578; U. S. v. Arredondo, 6 Pet., 691.

The King's patents, not only of his liberties, but of his lands, tenements, and other things, should have no strict or narrow interpretation for the overthrow of them, but a liberal and favorable construction for the making of them available in law; and if the King's grant admit of two interpretations, one of which will make it utterly void and worthless, and the other will give it a reasonable effect, the latter is to prevail. Hancock v. McKinney, 7 Texas, 445; 1 Kent Comm., 460, note 6; Charles River Bridge v. Warren Bridge et al., 11 Pet., 589.

All the Spanish grants held by this court to be inchoate for want of approval of the Intendente referred the grantee to that officer for confirmation, and are dated anterior to the adoption of the Constitution of the Cortes in March, 1812, and those issued by a Governor of a province, and final and complete upon their face, without reference to any other authority for approval or confirmation, have been sustained, when brought before the courts of the United States. Jones v. Garza, 11 Texas, 187; Jones v. Muisbach, 26 Texas, 237; Paschal v. Perez, 7 Texas, 350-351, 369-370; Dangerfield v. Paschal, 11 Texas, 579; Paschal v. Dangerfield, 37 Texas, 275, 231; U. S. v. Domingo Acosta, 1

How., 24-27; U. S. v. Clark, 8 Pet., 444, 455 et seq.; Delassus v. U. S., 9 Pet., 434-435; U. S. v. Peralta, 19 How., 347.

A grant made in the name and assumed authority of the sovereign power of the country, cannot be restricted to the rules applicable to a special verdict; but if admitted, the court, jury or chancellor must receive it as evidence, both of the facts it recites and declares leading to and the foundation of the grant, and all other facts legally inferable by either from what is so apparent on its face; and it is a legal presumption that public and responsible officers, claiming and exercising the right of disposition of the public domain, did it by the order and consent of the government, in whose name the acts were done; and it may be reasonably and lawfully claimed as the effect of the title to Garcia, that it passed to him such estate as the government itself, in whose name and on whose behalf the official acts appear to have been done, had at the time the grant was made; and without the recognition of this principle there would be no safety in title papers, and no security for the enjoyment of property under them. Sabariego v. Maverick, 126 U. S., 261; Strother v. Lucas, 37 U. S. (12 Pet.), 410; Jones v. Muisbach, 26 Texas, 235.

"The court erred in finding as a conclusion of law, based upon the evidence of the case of Paschal v. Dangerfield, 'that there was an Intendencia in existence at the time and after this paper was executed, which would preclude the idea of the Alcalde having authority to extend or confirm titles,' and in not finding in lieu thereof, as a correct conclusion of law arising upon the court's own finding of facts, that the Governor had the power to make the grant, as he did, and to cause the final title to be extended by his sub-delegate of the proper jurisdiction, without referring the same to any other authority for confirmation, and that the power and authority of the Intendente to make the final adjudication and confirmation of titles of land had already been abrogated before this title was issued."

The ingenious argument of appellees herein rests upon the assumption that the intendants and intendancias must have been abolished in order to sustain a grant in full property, made by the military governor of a province, and carried out and issued in obedience to his order by his sub-delegate justice of the jurisdiction embracing the land; but appellant denies the truth of such assumption.

The power of the Intendants to make grants in fee to the public lands (Baldios o Realengos) was conferred by and rested entirely upon article 81 of the Ordenanzas de Intendentes, which is as follows:

"The Intendants shall also be special exclusive justices (Jueces Privativos) of the disputes and causes that may occur in the district of their provinces in regard to sales, compositions and distributions of royal lands, and of seigniory (Terrenos Realengas y de Senioria), it devolving upon the possessors and those soliciting new concessions thereof to fetch their rights and formulate their petitions before the same Intendants, so that these matters being legitimately prepared in conjunc-

tion with a promoter of my royal treasury that they may appoint, they may determine them according to law, with opinion of their ordinary counselor, and permit the appeals to the Superior Junta de Hacienda, or, in case the parties interested fail to appeal, give account to it with the original proceedings when they deem them in condition to issue the title, to the end that, on approving them, it may return them, either that they may issue, if no objection is offered, or that, before executing it, they may finish the proceeding the Junta may find wanting and prescribe; after which, without new embarrassments, the respective confirmations can be made, which the Junta Superior will issue in their due time, it, as well as the Intendants, their sub-delegates and all others, proceeding in accordance with what is provided in the royal instruction of October 15, 1754, in as far as it is not opposed to what is provided in this, without losing sight of the wholesome provisions of the laws cited therein, or of the law 9, tit. 12, lib. 3." (Ordenanzas de Intendentes, pp. 93-95.)

The subject matter of this article is the sales, compositions and distribution of the public royal lands, and of seigneory, and it creates a system respecting such subject matter only; and if it was repealed or suppressed previous to the date of the grant to Garcia involved in this suit, then the Intendent of San Luis Potosi cut no figure in this case. (Counsel quoted and discussed subsequent legislation, making extended citations from the Constitution of Spain of March 18, 1812, and the decree of October 9, 1812, regulating audiences and courts of first instance.)

GAINES, CHIEF JUSTICE.—This was an action of trespass to try title, brought by the plaintiff in error against defendants in error to recover a portion of a tract of land, claimed by the former under an alleged Spanish grant. The defendants claimed title by virtue of certain patents issued by the State of Texas.

The case was tried without a jury, and resulted in a judgment in favor of the defendants. There was an appeal to the Court of Civil Appeals upon the conclusions of fact and law filed in the trial court,—no statement of facts having been prepared and made a part of the record. The Court of Civil Appeals rendered a judgment of affirmance; and to reverse that judgment, the writ of error from this court has been applied for and obtained.

In his conclusions, the trial judge found, among other facts not necessary to recite:

"First. That in 1816 Jose Manuel Garcia obtained a grant from Jose Rafael Enriquez, the Justice at Palafox, to two sitios of land, said grant being as follows, to wit:

| | |
|---|---|
| Seal of Spain. | 'Two Reals.<br>    Third Stamp—Two Reals—Years eighteen hundred and fourteen and fifteen. |

To His Honor, the Governor:

Don Manuel Garcia, Captain of militia and a resident of the town of Palafox, with the greatest due respect and submission would appear before you and say: that I have, for about fourteen years, claimed and possessed as my own, two sitios of pasture lands of about one league at a distance of a quarter of a league from said town, on an eastern course, where I have opened a rancho, with dwelling houses, pens and fence, within a pasture ground formed by the bends of the Rio Grande, where I raise crops according to the seasons; and in as much as it is not my intention to abandon it, notwithstanding the enormous damages I have experienced from the savage Indians, and wish to secure it as a lawful possession, I request that you be pleased (if you consider it just) to order that I be placed in the lawful juridical possession of said lands, and that the proper Testimonio of it be given to me. Therefore, I request and pray that you be pleased to accede to my petition, wherein I shall receive favor and justice. I swear that I do not act maliciously and the requisites, &c.      Jose Manuel Garcia.

City of Monclova, the 20th of February, 1816.


Monclova, February 22, 1816.

In consideration of the merit acquired by the petitioner by improving and settling the tract of land which he mentions, and having possessed it several years, notwithstanding the evident risk from savage Indians, the Justice at Palafox will issue to him the respective documents for which he makes application.      Adam.


Town of San Jose de Palafox, April 20, 1816.

In conformity to the superior decree of the Governor of Monclova, Don Francisco Adam, extended on the margin of the petition, let there be given to the petitioner the sitios of pasture land which is formed by the bends of the Rio Grande, where he raises his respective crops. To which effect, I, the sub-delegate of this town, Jose Rafael Enriquez, will proceed to the examinations and survey of the same, as is stated by the party in his petition. This I have ordered by this decree signed by me, the said Judge, and my assisting witnesses with whom I act in default of a Notary Public, there being none according to law; which I certify.

In the same town, same day, month and year, I, the same Judge, and my assisting witnesses, jointly with the party interested, Don Manuel Garcia, proceeded to the tract of land indicated, in which I placed him in possession, the boundaries whereof run from the town tract (Egidos) on the West from the narrows (La Angostura) and on the east to the Llave creek; on the south it adjoins the bends (Ancones) which I did also adjudicate to him and gave him possession thereof without leaving any room to be occupied by another, and on the north to Santa Isabel Creek; giving him likewise possession of the dwelling houses and pens situated on the high ground on the same valley (Vega), where the said bends exist. By virtue of what has been practiced. in the name of the

King, Our Lord (whom God save), I order that he be not despoiled of said tract of land without a previous hearing and having forfeited it by due course of law, to be protected in it without prejudice of a third party or another representing a better right thereto, as being entitled to the same for his meritorious services and henceforth and forever, he may make such use thereof as he deems proper, unto him, his children and assigns, and for its perpetuation, I give him the present original title of possession, with assurance of transcribing a literal testimonio of it whenever the proper paper is on hand, there being none at present in the Revenue office. I, the said Judge, and my assisting witnesses signing hereto in default of a Notary Public, there being none according to law; which I certify.        Jose Rafael Enriquez.

Assisting:

Francisco de Errera.

Assisting:

Jose Marfia Gonzalez.

Second. That in 1818 the said Garcia conveyed this land to Don Rafael Enriquez by a conveyance written on the same sheet as the grant.

Third. That Rafael Enriquez conveyed this land to F. Gilbeau and Volney E. Howard, and that plaintiff by good and valid deeds derives title thereto through said Gilbeau and Howard.

Fourth. That both said grant and deed were archived in the General Land Office of Texas in December, 1846.

Fifth. That the deed from Garcia to Enriquez could not be detached or separated from the grant without leaving evidence that there was some other paper wanting belonging to said original grant.

Sixth. That Garcia and Enriquez had possession of a portion of the lands described in plaintiff's petition in the bends of the river south of the town of Palafox, from about 1813 to 1820; that the town of Palafox as well as the rancho were destroyed by the Indians about 1820; that there has been no possession of said lands since said date.

Seventh. That this grant was not platted as described in plaintiff's petition and so as to include any portion of the lands in controversy, until August, 1880; that prior to that time it was platted about ten miles north of its present location and at a point that would not include any portion of the lands now claimed, as shown in the following plat. (Here follows the plat.)

Eighth. That the defendants claim to have patents from the State of Texas to six sections of the land in controversy described in their answers, all of which were located after this land was platted in August, 1880, except survey No. 233.

Ninth. No evidence to support the three years' limitation or stale demand.

Tenth. That to run the course north, the last call in the grant, the line would not reach the Santa Isabel Creek; that the Santa Isabel Creek could be reached by running the course N. 28 E., but in doing so the survey would conflict with an older grant in the name of Joaquin Galan. I find that the course on which the N. line of the present loca-

tion is run is N. 70 E. to Santa Isabel Creek, and is on what was vacant land at the time of its location as shown in the following plat: (Here follows plat.)"

Upon the facts so found, the learned special Judge who tried the case, concluded that the grant required the approval of the Intendente of the province, and that for want of such approval it was void. The Court of Civil Appeals first held the grant valid, but upon a motion for a rehearing set aside their former judgment, and in an able and learned opinion concurred with the trial court and declared it void.

The question which first suggests itself to our minds is: Was the approval of an Intendente necessary to a grant of land in Mexico at the date of the alleged title in this case, to wit: in the year 1816? The Intendencias were created in New Spain by virtue of the royal ordinance for the establishment of Intendentes, issued on the 4th day of December, 1786. With the exception of certain northern and eastern provinces, which were put under the rule of Commandants General, Mexico was divided into twelve Intendencias. Texas was at first within the excepted territory, but some years afterwards was included within the Intendencia of San Luis Potosi. By article 81 of the ordinance mentioned above, the Intendentes are given exclusive power over the sale, composition and distribution of the royal lands. Hence it must be conceded, that so long as that article remained in force, in the absence of some special authority emanating from the King, no lawful title could issue without the approval or confirmation of that officer. But by a decree of the Cortes of the date of January 4, 1813, enacted for the express purpose of reducing the vacant and other public lands to private dominion, provision was made for the sale and distribution of such lands, and their distribution was placed under the control of the ayuntamientos of the respective municipalities with the approval of the provincial deputations. (Decrees of the Cortes, p. 56.) Of the decrees passed by that body, a Mexican writer says: "The revolution of 1808, in Spain, gave rise to the installation of the extraordinary Cortes of Cadiz in 1811, which, dissolved in 1814, were re-established in 1820, and the laws which they enacted from the date of their installation until the 27th of September, 1821, in which the independence of Mexico was established, form, likewise, part of the legislation which rules it to-day." (1 Novisimo Sala Mexicano, p. 18.) In 1814, upon his restoration, the King, Ferdinand VII., issued a manifesto in relation to the Constitution which had been established by the Cortes, declaring it his "royal purpose" "not only not to swear or accede to the said Constitution or to any decree of the general and extraordinary Cortes, or the ordinary Cortes already issued, that is, such as deprived him of the rights and prerogatives of his sovereignty, established by the Constitution and laws under which the nation had for a long time continued," and further declaring that Constitution and those decrees void. But the manifesto contained this further declaration, "in order that there may be no interruption in the administration of justice in the interval before the restoration of order,

and of the observance in the kingdom of the system prevailing before the recent innovations, in relation to which, without loss of time, there will be suitable provision, it is my will that until such time, the ordinary justices in the towns which are found in office, the judges de letras wherever they may reside, and the audiences, intendants and other tribunals of justice in the exercise of their judicial powers, and in relation to political and administrative matters the ayuntamientos of the towns shall remain as at present, and in the interim whatever is proper to be preserved shall remain, and until the Cortes, which I shall convene, shall, having examined into the matter and the permanent arrangement in this branch of the government of the kingdom, shall be established." (I Decretos del Rey Ferdinand VII, p. 1, translated in Rockwell's Spanish and Mex. Laws, p. 404.) This left in effect the decrees of the Cortes affecting the ordinary administration of the government.

But it is claimed, that the decree in relation to the distribution of the vacant lands was annulled by subsequent royal edicts. In the case of the United States against Clarke, 8 Pet., 455, Chief Justice Marshall speaking for the court says, that the decree in question "seems to have been repealed on the 22nd of August, 1814." But the Royal Cédula of the date mentioned relates only to the proprios of the several municipalities of the kingdom. It purports to place these proprios under the jurisdiction and control of the King's Council and to annul the decrees of the Cortes in so far as the administration of that branch of the public service was thereby affected and to restore that administration to the state in which it existed in the year 1808, the time the king was deposed by the French invasion. What the proprios were, is not a matter of doubt. They were productive lands the usufruct of which had been set apart to the several municipalities for the purpose of defraying the charges of their respective governments. (Escriche's Dictionary; Words, "Proprios y Arbitrios.") The vacant lands, that is to say, the unappropriated royal domain, are designated as "baldios o realengos." (See the words in Escriche.) It is quite clear we think that the Royal Cédula of August 22, 1814, did not affect the decree of January 4, 1813, in so far as it provided for the sale and distribution of the vacant lands.

But it is asserted, that the "decree was abrogated by a royal ce'dula of the eighth of July, 1814." (Hall's Mexican Law, 48.) Practically the same assertion is found in a note to the "Novisima Recopilacion," found in the eighth volume of Los Codigos Españoles, page 520. This presents a much more difficult question. The title of that Cédula, as we translate it, reads as follows: "Royal Cédula of his Majesty and Lords of his Council, by which is explicitly annulled the seventh article of the decree of the Cortes of the 13th of September, 1813, and the ancient municipal arbitrios are commanded to be re-established, with whatever else that is expressed." Whether the title was the act of the King or of his council we have no means of determining. But it is found in the official publication. (1 Decretos del Rey Don Ferdinando VII, 114.) Omitting the long preamble, the decree as translated to the best of our

ability reads as follows: "I have deemed proper to annul explicitly the said article VII of the decree of the Cortes of the 13th of September, 1813, and to command, that the ancient municipal arbitrios conceded to the towns in order to provide for their urgent demands be re-established on the footing on which they were in the year 1808, with the inclusion of that awarded (or provided as a resource) upon the baldios, which by the other decree of the same Cortes of the 4th of January of the same year, 1813, were directed to be sold and distributed." The participial phrase which we have given a double translation is "lo arbitrado." The meaning of the verb "arbitrar" as given in the dictionaries is to "adjudge or award" or "to strike out means or expedients." The noun "arbitrios" has a well-defined technical signification. Escriche gives its meaning as, "the taxes which in default of proprios a town imposes with competent authority upon certain articles of merchandise." As indicating the sources of revenue of a municipality, the words "proprios" and "arbitrios" are usually found linked together and when so connected they are sometimes used as meaning "ways and means." That the inhabitants of the towns had been granted some rights in the vacant lands is shown by the section II of the Royal Regulation of October 15, 1754. That section reads in part as follows: "The judges and officers, to whom jurisdiction for the sale and composition of the royal lands (realengos) may be sub-delegated, shall proceed with mildness, gentleness, and moderation, with verbal and not judicial proceedings, in the case of those lands which the Indians shall have possessed, and of others when required, especially for their labor, tillage, and tending of cattle. But, in regard to lands of community, and those granted to the towns for pasturage and commons, no change shall be made; the towns shall be maintained in the possession of them." (2 White's Recopilacion, 63.) See also Hamilton's Mex. Law, 77. That the word "arbitrios" was sometimes used in a general sense, as meaning the resources of the towns, and included their privileges in the royal lands, as well as the taxes, is indicated by the decree of the 4th of January, 1813, itself. The object of the decree as expressed in the preamble is to reduce the common lands (los terrenos comunes) to private ownership. The lands, the subject matter of the decree, are described in the first article as "todos los terrenos, baldios o realengos y de proprios y arbitrios" etc.—all the lands vacant or of the royal domain and of the proprios and arbitrios. The exidos or the commons of the towns, that is to say, the parks, common pleasure grounds and the like, are excepted. The mention of the arbitrios suggests that there were lands subject to some municipal privileges other than the proprios. But we do not feel warranted in hazarding any opinion upon the question. But when we look to the entire cedula of July 8, 1814,—the title, the preamble and the order of the king, we incline to think, at least, that it was not one of its purposes to annul the entire decree of January 4, 1813, and to restore the power of the intendentes over the vacant lands. The title which has been already quoted names the decree of September 13th,

but does not mention that of January 4, 1813.   The preamble, as seems
to have been usual in matters of great importance, sets forth in great
detail the reasons which, in the opinion of the king, justified his action.
He states in substance, that the effect of the decree of September 13,
1813, which removed the taxes upon articles of consumption, with a
view to set free the internal commerce of the realm, was to leave the
nation deprived of the bountiful resources, resulting from its ancient
and agreeable (suaves) indirect taxation, by the substitution of another
system which had filled the people with bitterness and discontent, and
also to deprive the municipalities of the means to defray the ordinary
expenses of their government.   Upon the predicate so laid, the king
founds his decree, annuls the laws which had changed the method of
taxation conferred upon the towns, and restores their privileges as they
existed in 1808.   There is nothing in the long and labored preamble to
indicate that it was the royal purpose to interfere in any manner with
the disposition of the vacant land—except in so far as the municipalities
or their inhabitants might have some direct interest in such lands.   Con-
fessing our inability to reach any satisfactory conclusion upon the mat-
ter, we are of the opinion, that giving the Cédula in question its widest
scope under reasonable rules of construction, it did not have the effect
to repeal the decree of January 4, to such an extent as to restore the
jurisdiction of the intendentes over the vacant lands.

Our conclusion is fortified by the opinion of a recent Mexican author,
who has written an extended treatise on the subject of the vacant lands
in his country.   After quoting the decree of January 4, 1813, he says:
"This decree is the last legislative act of which we know, that has
emanated from the Spanish state, and which is occupied with the mat-
ter of the vacant lands.   We shall not detain ourselves in long com-
mentaries upon this law eminently clear in its construction and design,
and which we should probably obscure by attempting to expound it.
We shall merely admonish the reader, that by articles XI and XVII of
this decree the Cortes commit to the ayuntamientos of the towns the pow-
er of issuing titles in full property, which have to be given of common,
royal or vacant lands; and to the provincial deputations the power of
approving or disapproving the relative concessions.   From the promul-
gation of this law, the intendentes were prohibited from extending
titles of proprietorship for sales or compositions of the lands, and if
they went so far as to issue any one after that promulgation, such title
would be radically null, and insufficient to gain by prescription the pro-
prietorship in an immovable." (1 Orozco's Terrenos Baldios, 113.)   The
author then proceeds to point out that the provincial deputations were
never established in Mexico and that in his opinion no valid titles could
have issued there under the decree for the want of the provincial depu-
tations, whose approval was essential to their validity.   He is probably
correct in saying these deputations were never established because
shortly after his return to power the king promptly suppressed them.
(1 Decretos del Rey, pp. 74 and 95.)   What Orozco means by saying that

this was the last decree concerning the vacant land, emanating from the Spanish state, we do not fully understand. By royal decree issued in 1818 the sale of these lands was again ordered to pay the public debt, and in 1819 rules were passed for putting the decree in execution. Again in 1820, upon the re-establishment of the Cortes, the distribution of the lands was a second time ordered by that body. Owing to the condition of the country then existing and to the short time which elapsed from the promulgation of these decrees until the independence of Mexico was assured, it is probable they were never put into effect; and this may be what the author means by saying that the decree of January 4, 1813, was the last upon the subject. But again in another place, in speaking of the decree of the 4th of January, 1813, he says: "This decree committed the power of confirming the grants of lands in the colony to the provincial deputations of which the same decree speaks. In this State the legislation upon the royal, now called the natural or vacant, lands remained until the consummation of our independence." (2 Orozoco Terrenos Baldios, 770.) We do not know to what weight the opinion of this writer is entitled, but we do know that he has the merit of expressing his views with remarkable clearness and intelligence, and that he speaks in no uncertain voice.

If Orozco be correct, as we incline to think, then there was no general law for the disposition of the vacant lands in force in Mexico, from the date of the decree in question until after its independence was established. And even if the jurisdiction of the ayuntamientos over such lands were taken away by the Royal Cédula of July 8, 1814, it may be gravely doubted whether it was intended to re-establish the authority of the intendentes in that particular.

We incline to think that by reason of the disorders which had grown out of foreign domination, war and internal dissensions, it was deemed best to promulgate no general decree upon the subject. Such a consideration would have especial weight when applied to Mexico, where one formidable insurrection had just been suppressed and preparations were doubtless being made to accomplish a revolution and to establish the independence of the country. We hardly think, however, there was any well defined intention to depart from the ancient policy of alienating the lands for the purpose of settling the country and of the promotion of agriculture and other industries. This especially applies to that portion of Texas in which the land in controversy is situated, where the savages of that frontier, as we know historically as well as from the evidence in this case, had not at the time ceased to contest with Spain the possession of the country. It may have been deemed best under the existing circumstances to control the matter by special authority issued to the governors of provinces or other officers and to regulate each grant of authority according to the exigencies of the particular territory. Coahuila and Texas were what was known as "distant provinces" and as we shall hereafter see by the Royal Regulation of October 15, 1754, it had

been found necessary to authorize a sub-delegation of authority as to the lands in such provinces. (2 White's Recopilacion, 63.)

Such being the state of the Spanish laws applicable in Mexico at the date of the purported title in controversy, as we can best determine it in the obscurity which surrounds the question, we think the rule as frequently announced in this court and in the Supreme Court of the United States in regard to the presumption of authority in the officer who has issued a grant is strictly applicable in this case. The case of the United States v. Peralta, 19 How., 343, involved the validity of grant issued by the Governor of California a few years after the independence of Mexico. The title was attacked upon the ground that the Governor had no authority to extend it. In their opinion the Court say:

"We have frequently decided that 'the public acts of public officers, purporting to be exercised in an official capacity, and by public authority, shall not be presumed to be usurped, but that a legitimate authority had been previously given or subsequently ratified.' To adopt a contrary rule would lead to infinite confusion and uncertainty of titles. The presumption arising from the grant itself makes it prima facie evidence of the power of the officers making it, and throws the burden of proof on the party denying it. The general powers of the governors and other Spanish officers to grant lands within the colonies in full property, and without restriction as to quantity, and in reward for important services, were fully considered by this Court in the case of United States v. Clarke, 8 Pet., 436.

"The appellants, on whom the burden of proof is cast to show want of authority, have produced no evidence, either documentary or historical, that the Spanish officers who usually acted as governors of the distant provinces of California were restricted in their powers, and could not make grants of land. The necessity for the exercise of such a power by the governors, if the crown desired these distant provinces to be settled, is the greater, because of their distance from the source of power. By the royal order of August 22, 1776, the northern and northwestern provinces of Mexico were formed into a new and distinct organization, called the Internal Provinces of New Spain. This organization included California. It conferred ample powers, civil, military and political, on the commandant-general. The archives of the former government also show that as early as 1786 the governors of California had authority from the commandant-general to make grants, limiting the number of sitios which should be granted. In 1792 California was annexed to the vice-royalty of Mexico, and so continued till the Spanish authority ceased. An attempt to trace the obscure history of the various decrees, orders and regulations of the Spanish Government on this subject would be tedious and unprofitable."

So in the case of the United States v. Clarke, supra, which involved the question, whether the governor of East Florida had exceeded his power in the extent of the grant, Chief Justice Marshall says:

"A grant made by a governor, if authorized to grant lands in his

province, is prima facie evidence that his power is not exceeded. The connection between the crown and the governor justifies the presumption that he acts according to his orders. Should he disobey them, his hopes are blasted, and he exposes himself to punishment. His orders are known to himself and to those from whom they proceed, but may not be known to the world.

"Such a grant, under a general power, would be considered as valid, and if the power to disavow it existed, until actually disavowed. It can scarcely be doubted, so far as we may reason on general principles, that in a Spanish tribunal a grant having all the forms and sanctions required by law, not actually annulled by superior authority, would be received as evidence of title."

The same rule has been frequently announced in this court. (Jones v. Garza, 11 Texas, 186; Hancock v. McKinney, 7 Texas, 384; Holliman v. Peebles, 1 Texas, 699; Jenkins v. Chambers, 9 Texas, 167.) In Jones v. Garza, Judge Lipscomb, speaking for the court, says:

"What credit should be accorded to the acts of an officer, assuming to discharge an official attribute, in the absence of all evidence to show what are his precise powers, has been too well settled in this court, to allow a discussion on the subject. We have held and do hold, that he is presumed to act within the scope of his legitimate powers."

Jones v. Muisbach, 26 Texas, 235, was a second action of trespass to try title, brought under the statute then in force on the same grant that was held void in the case from which we have last quoted; and there is nothing in the opinion in the second suit in conflict with the doctrine so distinctly announced in the first. In Jones v. Muisbach the Court state that, "it has frequently been held by this and other courts, that where an officer of a former government assumes to act in discharge of an official attribute, in the absence of all evidence to show what are his precise powers, he will be presumed to act within the scope of their legitimate extent." The Court then proceed to say, that if the officer be one whose powers are known and well defined and the authority exercised be such as does not ordinarily pertain to the office, the burden rests upon the party asserting it to prove it by affirmative testimony. It was held in both suits that parol testimony was admissible to show whether the officer had the power to extend the title or not. In the first action the testimony of a witness that the power did not exist, was admitted. The court quote his testimony and hold it sufficient to prove the want of authority. In the second suit, the testimony of three witnesses was admitted, one testifying against the existence of the power and the others in its favor. The testimony of the witness to show the want of the authority was held more trustworthy than that of the other two, and the trial court having decided against the validity of the title, we do not see how the court could have reversed the judgment upon that point. It is true, that in both opinions, the Court say that the powers of the political chief are well known and defined by written law, and that by virtue of his office he did not have authority to grant lands; but in Norton

v. Mitchell, 13 Texas, 47, it is intimated that he may have had special authority. The grant in that case, which was made by the same officer who extended the title to the Baron de Bastrop passed upon in Jones v. Garza and Jones v. Muisbach, was sustained; but the decision proceeds upon the ground, that the record did not show that the point was presented in the lower court.

It may be that the ordinary powers of a political chief are so definitely ascertained that a grant by him should be held void in the absence of affirmative proof of special authority. It does not follow that the same may be said of the governor of a province. The Royal Regulation of October 15, 1754, which relieved the subjects of the realm from applying to the king in person for grants of land, authorized the viceroys to appoint sub-delegate judges with jurisdiction over the disposition of the royal domain, and these were empowered "to sub-delegate their commissions to others for the distant parts and provinces of their stations." (See sec. 2 of the decree, 2 White's Recopilacion, 63.) The third section speaks of "the judges and officers to whom jurisdiction for the sale and composition of royal lands may be sub-delegated." (2 White's Recopilacion, 63.) So much of the decree was doubtless repealed by the ordinance establishing the intendencias in New Spain; but when, by the decree of the Cortes, the jurisdiction of the intendentes over the vacant lands was taken away, we see no reason why the power to make grants may not have been temporarily conferred upon the governors of the distant provinces. Numerous titles emanating from the Governor of East Florida during the period in question have been held valid by the Supreme Court of the United States. U. S. v. Clarke, 8 Pet., 436; U. S. v. Clarke, 9 Pet., 168; U. S. v. Heurtas, 9 Pet., 171; U. S. v. Levy, 13 Pet., 81; U. S. v. Clarke, 16 Pet., 228, and many others.) However, it is well understood that the governors of that province, unlike the governor of West Florida, had the power to grant lands without the approval of the intendente. We cite the fact of his authority merely to show, that it was a power which was sometimes conferred upon and exercised by the governor of a province.

It is not inconsistent with our views, that during the same period, grants in West Florida required the approval of the intendente. The intendencia of Cuba, to which the Floridas were subject, was not one of those established by the Ordinance of the Intendentes, and it is not surprising, the regulations should be made in reference to the former which were not made applicable to the latter intendencias. Accordingly we find that the king, on the 8th of June, 1814, issued an order to the Intendente of Habana, commanding that notwithstanding the decree of the Cortes of the 4th of January of the previous year, he should observe the laws of the Indias and the Ordinance of the Intendentes in relation to the disposition of the royal lands.

We find from the report of the case of Sabariego v. Maverick (124 U. S., 261) that in 1817 the intendente at San Luis Potosi directed a sale of certain lands situate in the jurisdiction of Bexar alleged to have been

confiscated on account of the rebellion of its owner. That the inten-
dente at that date asserted jurisdiction over confiscated lands is not
inconsistent with the theory that he had none over the vacant domain.
The latter was the king's special prerogative—to be sold or to be
granted as a reward of merit, or· as a matter of pure favor. The con-
fiscated lands belonged to the royal treasury, the administration and
superintendence of which was ever a peculiar function of the intendente.

In view of the obscurity in which the whole matter is involved, we
conclude, that it should be presumed that the governor who caused the
title in controversy in this case to be extended did not usurp the author-
ity. At the time Spain was an absolute monarchy. The will of the
king promulgated as such, in whatever form expressed, was the law of
the realm. The government was substantially that of a military regime;
and it is not to be presumed, that the governor of a province who stood
second in authority under the king, assumed the power to make a grant
of the royal domain, without being authorized to do so.

But it is insisted on behalf of the defendant in error, that the docu-
ments relied upon do not evidence an extension of the final title to the
lands. We do not think that this contention can be sustained. The
applicant prays the governor that he may be placed in lawful juridical
possession of said lands and that the proper testimony be given to him.
The governor directs the Justice of Palafox to issue to him the docu-
ments for which he makes application. In pursuance of this order, the
officer delegated adjudicates to him and gives him possession of the
lands, orders that "he be not despoiled of it;" that "he may make such
use thereof as he deems proper, unto him, his children and assigns."
This is a final title. It is not dependent upon any condition and there
is nothing on the face of it to indicate that it is subject to the approval
of any higher authority. We attach no importance to the fact, that the
document is not written upon stamped paper. The want of a stamp
may have made proof of the instrument necessary. (Jones v. Montes,
15 Texas, 351.) But there is no question of proof in this case. So far
as the record shows, the instrument was admitted without objection.
The contention that the document is neither a protocol nor a testimonio
cannot be maintained. The language upon which this contention is
based is: "And for its perpetuation, I give him the present original
title of possession with assurance of transcribing a literal testimonio
of it whenever the proper paper is on hand, there being none at present
in the revenue office; I, the said Judge, and my assisting witnesses sign-
ing hereto in default of a notary public, there being none according
to law; which I certify." Under the Spanish system of conveyancing,
"a public instrument is divided into three classes; the original draft,
register or protocol (registro), the original and the copy. The register
is the original draft or writing, which is delivered, and remains in the
possession of the escribano, which we also call protocol, by which doubts
are determined that may be offered with respect to· the instruments
which are copied from it. The deed which is immediately copied from

the protocol is the original which causes faith, inasmuch as it is authorized by the public escribano, before whom it passed, or by him to whom the protocols of the latter have passed, but if another escribano copies it, with the authority of the Judge and citation of the party, it is valid. The traslado is called the copy which is taken from this original, which ought to be done with the same circumstances of the latter." (Azo & Manuel's Institutes, 1 White, 297.) What we understand the officer to mean is, that he issues to Garcia the instrument as present original evidence of title, and that when stamped paper can be procured, he will issue a testimonio upon such paper. The sole advantage of the stamped paper was that when the instrument was executed upon such paper in due form and with the necessary number of witnesses, proof of its execution was dispensed with. (Jones v. Montes, supra.) We deem it a matter of no moment what the instrument may be called. In Downing v. Diaz, 80 Texas, 436, the Court say, "and we may be permitted here to say that after so great a lapse of time, with our restricted means for acquiring correct information, it would not be just to assume that what was deemed sufficient evidence of right by the officers of the former government, who must be presumed to have been familiar not only with the general laws then in force but with the special laws and usages of the time, as well as the facts attending a particular transaction, is now entitled to no consideration."

For the reasons given we think the plaintiff in error showed title to the land in controversy and therefore the judgment of the Court of Civil Appeals and that of the District Court are reversed and judgment here rendered for him.

*Reversed and rendered.*