## STATE v. BALLI et al.

No. 11220.

Court of Civil Appeals of Texas. San Antonio.

June 23, 1943.

Rehearing Denied July 21, 1943.

Gerald C. Mann, Atty. Gen., Peter Maniscalco and Fagan Dickson, Asst. Attys. Gen., and Robert E. Kepke, former Asst. Atty. Gen., of Tulsa, Okl., for the State.

Sydney Smith, of El Paso, and W. C. Franklin, of Tulsa, Okl., for appellant Hector Crandall.

Potter & Bezoni, of Tyler, for appellant Kernel Hughes and others.

Davenport & Ransome, of Brownsville, Kleberg, Eckhardt & Lowe, of Corpus Christi, Lawler, Wood & Childress, of Houston, J. W. Timmins, of Dallas, J. T. Canales and Seabury, Taylor & Wagner, all of Brownsville, B. D. Tarlton, of Corpus Christi, Paul A. McDermott, of Fort Worth, and Howell Ward, of Corpus Christi, for appellee.

NORVELL, Justice.

This action involves the validity of the Balli claim or title to "Padre Island," a well-known sandbar or island, about 110 miles in length, lying within the present counties of Nueces, Kleberg, Kenedy, Willacy and Cameron. The island is bounded on the north by Corpus Christi Pass; on the west by Laguna Madre; on the south by the Pass of Brazos Santiago, and on the east by the Gulf of Mexico.

■ Trial was to the court without a jury. Judgment was rendered against the State and in favor of appellees who hold under the Padre, Nicolas Balli, and his nephew, Juan Jose Balli. No findings of fact or conclusions of law appear in the record, consequently all fact issues having support in the evidence are presumed to have been found in support of the judgment.

The State's trial petition describes the island by field notes occupying eighteen pages of the transcript, which were prepared by J. S. Boyles, a licensed State Land Surveyor. According to Boyles' calculation, the island at the time of his survey, which was completed on September 26, 1941, contained 135,213.03 acres, or about thirty and one-half leagues.

■ The State as sovereign, by the exhibit of its petition, made out a prima facie case for the recovery of the lands described therein. State v. Delesdenier, 7 Tex. 76; Day Land & Cattle Company v. State, 68 Tex. 526, 4 S.W. 865. The burden therefore devolved upon appellees to establish that either the State of Texas, or some prior sovereign, had relinquished, ceded or granted the lands here involved to appellees' predecessors in title.

The principal question presented relates to the validity of an alleged grant from the State of Tamaulipas to the Mexican citizens, Nicolas and Juan Jose Balli, in the year 1829. Appellees exhibited a chain of title from these original grantees. It seems that Nicolas Balli was in possession of the island prior to 1829, under a claim of right emanating from the Spanish authority in America at some date prior to the Mexican Revolution. Since 1829, possession of the island has been held either by the Ballis or those holding under them. During the years 1848 to 1852, both inclusive, it appears that the island was owned by citizens of Mexico, the principal owners being Jose Maria Tovar and Nicolas Grisante; that is, the parties mentioned or referred to were the owners assuming that the grant to the Ballis was valid. It also appears that taxes assessed against the lands involved by the State and its political subdivisions have been paid by appellees or some of them and their predecessors in title.

Appellees contend that Nicolas Balli and Juan Jose Balli obtained a title to Padre Island from the Mexican State of Tamaulipas which was good in equity and consequently protected by the Treaty of Guadalupe Hidalgo, Feb. 2, 1848, 9 Stat. 922 (Kenedy Pasture Company v. State, 111 Tex. 200, 230, 231 S.W. 683, 693), as well as by the rule of law of nations that the dominion acquired by another sovereign over an inhabited country does not divest the vested rights of individuals to property. Delassus v. United States, 9 Pet. 117, 133, 9 L.Ed. 71, 77; Maxey v. O'Connor, 23 Tex. 234, 243.

Appellees as an alternative proposition also assert title under and by virtue of the Relinquishment Act of February 10, 1852, contending that all defects, if any there be in the Mexican title, were cured, the title validated, and all rights of the State in and to the island relinquished by this action of the Texas Legislature.

If the existence of a valid grant be established, there remain to be determined certain questions as to the extent of the grant. Is it limited to 11.15 leagues or does it extend to the superficial area of the island? Do the accretions to the island belong to the appellees, as owner of the upland, or do they belong to the State of Texas? Where is the line of demarcation between the sea and the island?

In our opinion the case may best be discussed from the standpoint of appellees' contentions and the questions above set forth. This is not in accordance with the arrangement of points (ten in number) contained in appellant's brief, but is deemed a logical approach toward a disposition of said points, all of which will be disposed of in this opinion.

Appellees' primary contention may be designated as "Title under the Treaty of Guadalupe Hidalgo." Appellant's points relating thereto are:

"The Court's error in failing to hold that no grant from Spain or Mexico was ever issued to Padre Island (III).

"The Court's error in failing to hold that a grant of Padre Island was not in fact made and could not legally have been made under the Mexican laws then in force as applied to the undisputed facts here presented (IV).

"The Court's error in holding that the admittedly incomplete proceedings relied upon by (appellees) divested Mexico of either legal or equitable title (V).

"The Court's error in holding that the Treaty of Guadalupe Hidalgo confirmed (appellees') or their predecessors' claims to Padre Island (VI).

"The Court's error in failing to hold that the facts proved refuted any possibility of the presumption of a grant (VII)."

Appellees' alternative contention we designate as "Title Under the Act of February 10, 1852." Appellant's points relating thereto are:

"The Court's error in failing to hold that the Act of February 10, 1852, expressly refused to release or confirm the title to the island here sued for (II)."

"The Court's error in holding that (appellees') claims are not barred by their failure to make a survey and to file field notes thereof in the General Land Office by January 1, 1880, as required by Sec. 8 of Article XIV of the Texas Constitution, Vernon's Ann.St. (I)."

As to "the extent of the grant," appellant asserts the following points:

"The Court's error in holding that (appellees) in any event could recover 30½ leagues under a survey confined to 11.15 leagues (VIII).

"The Court's error in holding that (appellees) are entitled to recover any land formed since 1829 by accretion (X).

"The Court's error in holding that (appellees) in any event are entitled to recover the land situated between mean high tide line and highest winter tide line (IX)."

The term "grant" as used in the briefs is generally employed in its broad sense or meaning, to signify a cession of real property by the sovereign to an individual by whatever procedure this is accomplished, rather than in its strict sense as meaning a final certificate of title issued by the executive of the sovereign as in Kenedy Pasture Company v. State, 111 Tex. 200, 231 S.W. 683. The usage of the briefs is followed in this opinion, and the instrument evidencing the final action of an executive will be called a "final certificate."

The political and historical background of the section of the State which embraces Padre Island is set forth in a number of decisions by our Supreme Court, notably Kenedy Pasture Company v. State, supra, and State v. Sais, 47 Tex. 307. We quote from the opinion of Chief Justice Roberts in the case last mentioned:

"That portion of Texas situated between the Rio Grande and Nueces river, south of a line drawn from the northern boundary of Webb county to the mouth of Moros creek, on the Nueces river, was originally a part of the State of Tamaulipas, in Mexico, whose capital was Victoria, some distance west of the Rio Grande. That section of country was but sparsely settled, and was used principally for stock ranches, that had long been subject to frequent depredations from savage Indians. On the 19th of December, 1836, an act of the Congress of Texas was passed, defining the

boundaries of Texas, in which that territory was included. Notwithstanding that, however, the State of Texas exercised no permanent jurisdiction over it, except along and near the Nueces river, including Corpus Christi, on the gulf; and the State of Tamaulipas exercised jurisdiction on and near the Rio Grande, on the eastern side of it, until after the annexation of Texas to the United States, (on the 29th of December, 1845) shortly after which, armed occupation of the disputed territory was taken by the United States, on behalf of Texas, since which time Texas has exercised jurisdiction over it. Paschal's Dig., art. 438; Calkin v. Cocke, 14 How. 227 [14 L.Ed. 398]; Lee v. King, 21 Tex. [577], 582; Trevino v. Fernandez, 13 Tex. [630], 663; Martin v. Weyman, 26 Tex. [460], 465.

"By the 'Articles of Annexation,' consent was given by the United States, 'that the territory properly included within and rightly belonging to the Republic of Texas may be erected into a new State, to be called the State of Texas,' upon certain conditions and guarantees, one of which was that the State to be formed should be 'subject to the adjustment by the Government of all questions of boundary that may arise with other governments.' (March 1, 1845, Paschal's Dig., p. 44.) The assent of Texas to such terms was formally given in the convention, by an ordinance, on the 4th day of July, 1845. (Paschal's Dig., p. 45.) On the 29th of April, 1846, the Legislature of Texas adopted a joint resolution, declaring 'that the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of Texas was acquired by the valor of the people thereof, and was by them vested in the Government of the Republic; that such exclusive right is now vested in, and belongs to, the State, excepting such jurisdiction as is vested in the United States by the Constitution of the United States and by the joint resolution of annexation, subject to such regulations and control as the Government thereof may deem expedient to adopt.' (Paschal's Dig., art 441.) On the 2d of February, 1848, the treaty of peace, of Guadalupe Hidalgo, between the United States and Mexico, was concluded, by which the Rio Grande was established as the line between the United States and Mexico, and thereby settling the boundary of Texas, in reference to this part of the country, as between Texas, in the United States, and Tamaulipas, in Mexico. As between Texas and the United States, the right of Texas to the jurisdiction of Texas over the Territory east of the Rio Grande, was definitely settled by the act of Congress (called one of the compromise acts), on the 9th of September, 1850, and acceded to by Texas on the 25th of November, 1850. (Paschal's Dig., art. 443.) This had reference, however, particularly to the cession, by Texas to the United States, of that portion of New Mexico east of the Rio Grande.

"By the treaty of Guadalupe Hidalgo, it was stipulated that the civil rights of Mexicans, within the territory ceded to the United States, as they then existed under the laws of Mexico, should be protected by the United States. (U.S.Stats. at Large, vol. 9, pp. 929, 930.)

"The inhabitants, and others owning lands by titles, perfect and imperfect, within the territory east of the lower part of the Rio Grande, not having had the same opportunities as persons in other parts of Texas, to have their titles established and recognized by the authorities of Texas, a law was passed for that purpose as early as 1850, and another in 1854, under which commissioners were appointed to investigate and report upon their titles, many of which were confirmed as valid by an act of the Legislature of 1852. (Paschal's Dig., arts. 732–739.)"

Appellees claim title under and by virtue of certain proceedings which occurred during the years 1827, 1828 and 1829. The decree of the general Mexican Government, known as the Federal Law of Colonization, Decree No. 72, dated August 18, 1824, Sayles' Early Laws, Art. 40, 1 Gammel's Laws 97, was in force during this time, as was the Colonization Law of the State of Tamaulipas, Decree No. 42, dated December 15, 1826. Sayles' Early Laws, Art. 89, 1 Gammel's Laws 454.

Appellant contends that the record of proceedings embodied in the expediente fail to disclose a substantial compliance with the laws relating to the making of grants by the Mexican authorities. In view of the contention, as well as others raised by the briefs, it is necessary to examine the expediente in some detail.

### The Expediente

An expediente is an historical record of proceedings had and done in connection with the grant of land by the

sovereign. State v. Sais, 47 Tex. 307, 315. The particular expediente here involved was protocolized at Matamoros. Testimonios, copies having the legal status of originals, were ordered issued to the interested parties in accordance with the Spanish or Mexican custom relating to the evidencing of land titles.

Appellees undertook to establish the validity of the alleged grant from the State of Tamaulipas by introducing four purported copies of the expediente. The original expediente was properly archived at Matamoros. State v. Sais, 47 Tex. 307, 316; State v. Bustamente, 47 Tex. 320. Two of the copies tendered in evidence are examined copies of the protocolized expediente now existent in the archives of Matamoros. Both are photostatic copies of the protocol, certified to as correct by El Presidente Municipal (Mayor) of the City of Matamoros and attested by the secretary. Both copies also bear the certificate of the Consul of the United States of America at Matamoros, Mexico, to the effect that the signatures of the Mayor and Secretary are genuine and that such persons are in truth the Mayor and Secretary of the Municipality of Matamoros to whose official acts faith and credit are due. The Consul further certified that the copies had "been issued by the lawful custodian of the original document extant in the archives of the Municipality of Matamoros for the years 1827–1830."

The witness Gilbert Kerlin testified that he had carefully compared one of the copies introduced in evidence with the original in the archives at Matamoros and that the copy was true and correct.

Similar testimony as to comparison of the other photostatic copy was given by the witness O. D. Kirkland, an abstracter and County Clerk of Hidalgo County. These two examined copies were clearly admissible in evidence. State v. Sais, 47 Tex. 307, 317; Kenedy Pasture Company v. State, 111 Tex. 200, 230, 231 S.W. 683, 693.

We need not discuss the two additional copies introduced. One is apparently a testimonio issued upon the application of Jose Manuel Tovar in 1846, who at that time claimed ownership of a part of Padre Island under Nicolas and Juan Jose Balli. The fourth copy was evidently a compulsa, that is a judicially attested copy of a testimonio.

The translation of the expediente appearing in the record was made by J. T. Canales, Esq., a well-known attorney of Brownsville, Texas, whose familiarity with phraseology employed in both English and Spanish legal writings is conceded by the parties to this appeal.

The expediente relating to the cession or grant of the island to Nicolas and Juan Jose Balli discloses the following:

On December 11, 1827, the citizen Diego de Leon of the City of Victoria, the capital of the State of Tamaulipas, as attorney in fact "for the Presbyter Nicolas Balli, Cure for the Parish of Matamoros," made a denuncio or application to the Governor of Tamaulipas for a grant of the land in the Island of Santiago, reciting that he had appeared before the Court of Reynosa (the local seat of government of the ancient or Spanish jurisdiction) and applied for a testimonio of proceedings with reference to the granting of the Island of Santiago to the priest, Nicolas Balli, as antiguo or first settler, but that the protocol of these proceedings had not been found in the Reynosa archives. The applicant prayed that a search be made of the archives in Victoria for this expediente and if found that a testimonio thereof be issued to the petitioner in order that he might complete the application. In the alternative, in the event the expediente of the proceedings under the former Spanish jurisdiction were not found, the attorney in fact prayed that his application be treated "as a new application for the land of the island of Santiago that terminates at the Corpus Christi Bar and consists of nineteen and a half (19½) sitios, in favor of my Principal and of his nephew, Don Juan Jose Balli."

The Governor of Tamaulipas entered an order in effect approving the application, but reciting that no expediente such as that described in the application had been found in the Government archives. The Alcalde of the Village of Matamoros was directed to summon the State Surveyor, Domingo de la Fuente, and proceed with the visual inspection and survey of the island in accordance with law.

The visual inspection and survey were made under the direction of Juan Longoria y Garza, Second Alcalde of the Village of Matamoros. The Alcalde with his witnesses, appraisers and the official surveyor, on the 14th day of February, 1828, commenced the visual inspection beginning at

the south end of the island. On the 20th day of February he reached the north end, Brazo de Corpus Christi.

The expediente contains descriptions of the lands observed in the form of a daily report. For the most part, sand dunes, salty bays and some pasture grass are mentioned, although some mention of fresh water lakes is included. The report of the 20th, when the Alcalde was at the north end of the island, mentions "many fresh water lakes or pools covered with reeds, which are known to be permanent."

At the conclusion of the visual inspection and after having examined his witnesses and inspectors, the Alcalde describes the lands upon the island as "uneven and broken by reason of several deep gullies caused by drainage in time of floods, for some of these lands are overflowed where the sea came in in high tide" and as being "without a permanent source of water supply except during the rainy season when the various lakes and reservoirs therein situated are filled." The Alcalde also noted that the pasture lands on the island were inhabited for a short period by the savage tribe of Indians known as Tarancahuases, "though at present they are peaceful." The report concludes that the lands are "solely useful for horse stock and cattle."

The Alcalde then called upon the official surveyor to perform his duties. The surveyor "took a staff of medium length tying thereto one of the ends of the cord prepared for this purpose and measuring from said staff or stake fifty varas according to the official measure sealed with the Mexican seal as required by the State of Tamaulipas, and when said fifty varas were thus measured he tied the cord to another staff of the same length, and taking the compass he cast the first line, taking a course from north to south * * *." De la Fuente evidently began at Brazo de Corpus Christi, which the Alcalde refers to as Laguna Madre, as it there connected with the Gulf and ran from thence in a southerly direction along the Gulf shore. After stretching the cord one hundred ten times (5500 varas), the surveyor ran west (at right angles to the north and south line along the Gulf shore) to the border of the Laguna Madre. He found this distance to be 2000 varas. He then returned to the point on the Gulf shore from whence he had commenced the running of the line to the west, and by compass set a south

course and ran in that direction along the shore a distance of 15,000 varas (300 cord lengths). The survey was completed in this manner, that is, a line generally north and south was run down the Gulf side of the island. At intervals of about 10,000 varas a right angle or westerly line was run over to the Laguna Madre. De la Fuente filed a plat or demonstrative plan with his report. The western ends of the lines run to the Laguna Madre were arbitrarily connected together by straight lines and the area of the survey figured by calculating the area of the parallelograms and triangles formed by these arbitrary lines, the cross lines and the line along the Gulf shore. The plat indicates that de la Fuente did not run a north and south line (by compass) from the north end to the south end of the island. Some change of course is discernable at about 10,000 vara intervals. Neither the Gulf side survey line nor the Laguna Madre line, as disclosed by the plat, purports to be an accurate delineation of either the Gulf or Laguna Madre shore lines.

De la Fuente by the method above outlined calculated the area of the island at eleven sitios for large stock and six caballerias of land. A sitio for large stock, or league, contains twenty-five million square varas or 4428 acres. A caballeria contains one million square varas, or about 177 acres, making a total area according to de la Fuente of 49,770 acres.

The survey was completed on February 29, 1828. On May 25th the Plan Demonstrato was filed and the expediente remitted to the Governor of Tamaulipas.

The Governor's Council to whom the expediente was referred objected to the report of the visual inspection because it did not sufficiently describe the nature of the fresh water supply upon the island. As a result of this objection the expediente was returned to the Alcalde at Matamoros for correction.

The Alcalde called before him the witnesses and visual inspectors and made a further report as to sources of fresh water upon the island.

With reference to this second report, the Council advised the Governor as follows: "The Council (Consejo) is not satisfied with what has been done in this Instructive Dispatch in the discharge of what was required by its opinion of the seventh of last July and of Your Excellency's Decree dated the 12th of the same month, because

of the contradiction therein noted; however, it (the Council) may, if it is agreeable to Your Excellency, permit the remaining requirements of the law to be taken until this matter is concluded, requiring only that these proceedings be placed of record, and extending to the interested party, if he shall demand it, a corresponding copy of this 'testimonis' or legal proceedings."

The expediente was then referred to the fiscal (Attorney General of the Supreme Court of Justice of Tamaulipas) who pointed out certain defects in the proceedings and suggested remedies therefor. These may be briefly summarized as follows:

1. It does not sufficiently appear that adjoining owners were properly cited to a visual inspection and survey of the lands. The Alcalde should certify to proper citation, or if there are no adjoining owners, this fact should be reported.[1]

2. The reports as to fresh waters are unsatisfactory, as reported by the Council. The first report states there are lakes which will hold water for a whole year, while the second states these lakes will not last more than six months. This should be corrected and for the appraisement of the waters, the government should name one expert, and the interested parties should name another.[2]

3. There is no landmark to mark the starting point of the survey and this defect should be corrected.

In conformity with the opinion of the fiscal, the expediente was returned to the Alcalde at Matamoros and a government appraiser appointed. Nicolas and Juan Jose Balli likewise named an appraiser. The two appraisers made a full report and found that there was no permanent supply of fresh water on the island; that the pasture on the island was not good for horses but was suitable for other large stock. They appraised the land at a value of forty pesos per sitio.

The Alcalde further certified "that the place where the survey began was opposite the Brazo de Santiago, without mentioning any particular landmark, for the reason that that tract of land is a banco (ensenada) or island situated as already stated, between the Brazo de Santiago Bar, the Corpus Christi Bar, the Laguna Madre and the sea. For that reason and because said land is entirely surrounded by water there have not been any adjacent land owners at any time; but only has been in the possession of its very old (or ancient) and first settlers who are those that have been duly cited."[3]

When this report was forwarded to the State Government the Attorney General reported to the Governor that "it remains now only to deposit the price of eleven (11) sitios and six (6) caballerias which were surveyed * * * when this is done your Excellency may cause the Attorney of the Applicants to be cited so that each of his clients may designate the land where he wishes his land to be. In view of their statement it shall be ordered that the land shall be adjudged to each in equal parts designating which part belongs to one and which part belongs to the other and ordering the judge who presided at the survey to place them in possession of their respective parts causing the boundaries to be marked with permanent and noticeable monuments."

---

[1] All adjudication and possession of lands designated for settling shall be made with previous citation of the adjoining proprietors. As little detriment as practicable shall be occasioned to those who do not appear, of themselves or by attorney, and their complaints shall not be heard. Art. 22, Tamaulipas Colonization Law.

[2] The new settlers shall pay to the state as an acknowledgment, $30 for each sitio of grazing land, uncultivated, or woodland, that is adjudicated to them; and for those having the benefit of running waters an estimate shall be made by two competent persons, chosen by the executive and the settler, setting out from the established rule. Art. 23, Tamaulipas Colonization Law.

[3] It is inferable that the "ancient settlers," those who occupied the lands under the ancient or Spanish jurisdiction were the Padre, Nicolas Balli, his herdsmen or those claiming under him. The evidence shows that there is extant in the Matamoros archives a revoked will of Nicolas Balli, dated November 4, 1811, a clause of which reads as follows: "I claim as my property the grazing pasture of the Island, while I am not in possession, this is due to the unsettled times, but in fact I had it surveyed and adjudicated and I maintain in there 1000 head of cattle. I command my heirs that as soon as the times quiet down they shall endeavor to perfect it until the testimonio of the ownership (or title) is obtained. I so state that it may be noted."

It appears from a receipt issued by the Minister of Finance of the State of Tamaulipas that the purchase price of $446 was duly paid.

The expediente was returned by the Governor to the second Alcalde of Matamoros in order that he might put the applicants in possession of the lands in conformity with the terms expressed in the opinion of the fiscal.

The citizen, Macedonio Capistran, Second Constitutional Alcalde of Matamoros, having succeeded Juan Longoria y Garza in that position, had supervision over the proceedings relating to the act of juridical possession. By this time (December, 1829) Padre Balli was dead. Juan Jose Balli, for himself and as one of the executors of the estate of Nicolas Balli, designated his brother-in-law Rafael Solis as his attorney in fact to take possession of the island for him and the estate of Padre Balli.

The Alcalde, the attorney in fact and accompanying witnesses entered upon the island where the Alcalde "proceeded to place (the attorney in fact) in possession of eleven (11) sitios for large cattle and six (6) caballerias, of which the Island of Corpus Christi is composed; being comprehended within it the Island of this name the place or site known as 'La Boquilla de Loma Alta,' the ranch of 'Buene Vista,' 'El Devisadero,' 'Los Sauces de San Jose,' 'El Paso de San Agustine,' 'La Piedra Enterrada del Palmarito,' and 'San Juan de las Crusitas,' 'Los Laurelitos,' 'Carnes Tolendas' and 'Brazo de Santiago,' of which land the Citizen Rafael Solis took possession in the name of his Principal, Juan Jose Balli, of the part that belonged to him and for that part which belonged to the late, Bachelor Nicolas Balli, * * *." The Alcalde's report further states: "I the Judge, in the name of the free and sovereign State of Tamaulipas and in the presence of those above cited and of the others who were there present, took the aforesaid Rafael Solis by the hand, led him across the land, he took some earth and scattered it, he picked up a stick, he tore up the grass, he took some water and sprinkled the earth and performed other acts of true possession and said in a loud and intelligent voice:—'Gentlemen, all of you here present are my witnesses that I have taken possession in conformity with law without opposition from a third party that may claim a better right;' to which those standing replied: 'May it profit you much'; and I, said Judge, stated that I would protect and did protect him in the possession of it, from which he may not be ejected without first being heard, under oath, and legally adjudicated against and that he will never be required to have a new survey; which possession was taken in the presence of those aforementioned by virtue of which he is and must be considered the true and legitimate owner and lord of the half of said land, thus conforming to the fact that he has it denounced and adjudicated by the Government in virtue of the denunciation and payment to the latter. Being likewise placed in possession of the part of the land that as Executor of the aforesaid late Padre Balli he should have so that he, for himself, his heirs and successors as their own, they may sell, exchange and convey according to their will * * *."

The places mentioned in the record of the act of juridical possession are also mentioned in the report of the visual inspection as well as the report of the official survey of the island.

The final document of the expediente, in so far as date is concerned, is one dated December 25, 1829, executed by Macedonio Capistran, second Alcalde of Matamoros. This orders and directs that "these proceedings having been concluded and the matter terminated, this instructive dispatch (expediente) be protocolized in the archive under my charge, and the interested party, who has taken possession should apply to this Court for himself and his deceased uncle, Don Nicolas Balli for the legal certificate referred to in said supreme decree, so that with it he may appear before the Supreme State Government in order that there may be extended to them the dispatch and title of their ownership since they are in legal, quiet and peaceful possession of their respective lands; * * *."

### Title Under The Treaty of Guadalupe Hidalgo

We have set out in some detail the contents of the expediente as the proceedings reflected therein are of importance also in connection with other subdivisions of this opinion. Although the records of proceedings had with reference to the grant are unusually complete, the expediente does not contain a final certificate executed by the Governor of Tamaulipas. The State's principal contention upon this point is that

no final certificate could legally issue under the colonization laws in force at the time of the attempted grant of Padre Island, and therefore the title of the Ballis thereto was not "good in equity" so that it would be protected by the treaty of Guadalupe-Hidalgo. The State's contention specifically stated as a proposition is that: "The land in question is within ten littoral leagues of the sea and is an island, and under the laws of Mexico controlling this case, could not be granted without the previous consent of the Supreme Executive (the President) of Mexico. Such consent must be proven and in the absence of a grant (final certificate), or of such consent being expressly recited in the proceedings leading up to a grant, the consent cannot be presumed."

Articles 3 and 4 of the Federal Law of Colonization of the Republic of Mexico, Decree No. 72, of August 18, 1824, provided:

"Art. 3. For this purpose (the purpose of colonization) the Congresses of the States shall as speedily as possible form laws or regulations for the colonization of those lands which appertain to them, conforming in every respect with the fundamental Constitutional Act, the General Constitution, and the regulations established by this law."

"Art. 4. No lands lying within 20 leagues of the boundaries with any foreign nation, nor within 10 leagues of the coast, can be occupied by settlers, without the previous approbation of the Supreme Executive Power." (Sayles' Early Laws, Art. 89, 1 Gammel's Laws 454)

This decree was primarily designed to encourage the settlement of foreigners. The first article provides that "the Mexican nation offers to those foreigners who may be desirous of settling in her territory security for their persons and property, provided they obey the laws of the country."

In De Arguello v. United States, 18 How. 539, 15 L.Ed. 478, the Supreme Court of the United States had before it a question of the validity of a territorial and not a state grant, that is, a title issued by the Governor of the Mexican territory of upper California. It was contended that the grant was void "because under the regulations of 1824 lands lying within the littoral leagues could not be granted by territorial governors, but only by the supreme government." The Supreme Court of the United States held that Section 4 of the Act of 1824 applied only to foreigners and had no application to citizens of Mexico. No state legislation was involved. The Supreme Court does refer to the regulations of 1828, presumably of federal origin, as supporting its interpretation of the decree No. 72 of 1824.

In 1825 the Congress of Coahuila and Texas, in accordance with Decree 72 of the general or federal congress, promulgated its Decree No. 16, for the purpose of promoting colonization in the State of Coahuila and Texas. Section 7 of this decree reads as follows: "The executive shall take care that within twenty frontier leagues bordering on the United States line, and ten littoral leagues upon the coast of the gulf of Mexico, within the limits of the state, no other settlements shall be made than such as shall meet the approbation of the executive of the Union, to whom all future petitions on the subject accompanied by a corresponding report, shall be transmitted." Sayle's Early Laws, Art. 47; 1 Gammel's Laws 126.

The Supreme Court of Texas has uniformly held that attempted grants of land made by the governor of Coahuila and Texas while Decree No. 16 was in force, were void unless the approbation of the federal executive was shown. Goode v. McQueen's Heirs, 3 Tex. 241; Edwards v. Davis, 10 Tex. 316; Wilcox v. Chambers, 26 Tex. 180, 184; Wood v. Welder, 42 Tex. 396, 408. This rule or holding has also been followed by the Supreme Court of the United States as the established rule in Texas. Christy v. Pridgeon, 4 Wall. 196, 71 U.S. 196, 18 L.Ed. 322.

The colonization law adopted by the State of Tamaulipas in pursuance to Federal Decree No. 72 contains the following provision with reference to the approbation of the federal executive: "In the same manner he [the State Executive] shall take care that no town projected by foreigners be situated within ten leagues upon the coast of the gulf of Mexico, within the limits of the state, without previously obtaining the consent and approbation of the supreme executive of the Union. Beyond said line he shall also take care that, so far as the sites permit, the new towns be established in contact with the present ones, and with the conditions he stipulates with the empresarios." Sayles' Early Laws, § 11, Art. 89, 1 Gammel's Laws 454.

In Cavazos v. Trevino (1871–72), 35 Tex. 133, it was held that the approbation of the federal executive was unnecessary to the validity of a grant of land within the littoral leagues made by the Governor of Tamaulipas to a Mexican citizen.

In our opinion there is no conflict of decision in authorities above mentioned. In fact the reasoning of Texas Supreme Court in the cases holding that the approbation of the federal executive is necessary to the validity of grants within Coahuila and Texas (during a certain period of time) support the holding that the approbation of the federal executive was not necessary to the validity of a grant of lands within the state of Tamaulipas. The point is that the Supreme Court in the Coahuila-Texas decisions did not construe and interpret the Federal Decree of 1824 (No. 72), but accepted the interpretation of that decree as construed by the Congress of Coahuila and Texas in promulgating its decree No. 16, in 1825. This view is in accordance with correct civil law principles. Under the Mexican Constitutions, Federal or State, the legislative and not the judicial department possessed the power to interpret laws. These matters are fully discussed in Goode v. McQueen's Heirs, 3 Tex. 241. We quote from the opinion of Mr. Justice Lipscomb:

"Had the Congress of the State passed a law for the settlement of this land on the border, and authorized its Executive to have granted the same to new settlers, it might have been well questioned whether the judicial tribunals of the State could have adjudicated such act to be unconstitutional and void, on the ground of its repugnancy to the Federal Constitution. It would have presented a case of conflict between the political authority of the State and Federal Governments; and it might have been insisted that it would have to be settled between them, and was beyond the control of the judicial tribunals to say that the State Legislature had transcended its powers.

"The question may seem strange and preposterous to those who have been accustomed to see the uniform and harmonious action of the different departments of the government, under the Constitution of the United States and the several States composing the Union; and the proposition, that the judiciary had not the authority to declare an act of the Legislature void for its repugnance to the Constitution, would seem to involve a most manifest absurdity.

"It will, however, be borne in mind, that in all popular governments, the constitution embodies the will of the people, and their will is spoken through that instrument; and if the people have thought it inexpedient to repose such power in the judicial department, but to deposit it elsewhere, their will cannot be gainsayed. Both the Constitution of the Republic, and of the State of Coahuila and Texas, seem to have reserved this power to the legislative department. Article 165 of the Federal Constitution, is as follows, viz.: 'Congress alone has the right to interpret the Constitution in doubtful cases.'

"In the 97th article of the State Constitution, in the enumeration of the powers of Congress, will be found the following: 'To enact, *interpret*, amend, or repeal, the laws relative to the administration and internal government of the State, in all its branches;' and, in the article 172, it is directed, that 'the tribunals and courts of justice, being authorized solely for applying the law, *shall never interpret the same*, nor suspend their execution.'

"These extracts would seem to be conclusive, whenever the power of the Legislature to pass the act, was the question.

"This peculiarity in the Federal Constitution of Mexico, and the Constitution of the State of Coahuila and Texas, has been long known, and is no new discovery of modern research, drawn from the obscurity in which a different language from our own had allowed it to repose. Near ten years ago, in a conversation on the subject of the Constitution of Mexico, in which a Mexican gentleman, who enjoys considerable reputation among his countrymen as a jurist, participated, he expressed much surprise at what he thought an anomoly in the Constitution of Texas, that it was the *faculty of the judiciary to construe, and decide on, the constitutionality of acts of Congress*. He was opposed to it in principle, and believed that the Constitution of Mexico had wisely guarded against it.

"I have no doubt, that in the courts of Mexico, the judicial tribunals would not possess authority to say that any act of the Legislature was unconstitutional and void.

"If, then, there had been an act of the State Legislature that gave a right of property to the grantee, without reference to the approbation of the Federal Executive, it forming a rule of property, I would not feel myself authorized to say that it was

void, because repugnant to the general colonization law of the Republic. * * *"

A comparison of Section 7 of Decree 16 of Coahuila and Texas with Section 11 of Decree 42 of Tamaulipas demonstrates that the Congresses of the two States involved adopted different constructions of Section 4 of Federal Decree No. 72. Coahuila and Texas interpreted this Section 4 as being applicable to grants made to both foreigners and citizens, while Tamaulipas regarded said section as being applicable only to settlements of foreigners by empresarios.

This fact is also pointed out in Goode v. McQueen's Heirs, wherein Judge Lipscomb remarked, "The same [inhibition against grants within the border or littoral league without federal approval] will be found, also, in the colonization law of Tamaulipas (see Article 11, Col. Law Tam.) *with the modification, that no foreigners shall be settled.*" (Italics ours.)

The Tamaulipas law interpretating authority thus in effect agreed with the interpretation of the federal decree adopted by the Supreme Court of the United States in De Arguello v. United States, supra, wherein the Supreme Court of the United States construed the federal decree without the aid of a State legislative interpretation, since a territorial grant was involved.

Cavazos v. Trevino involved a State grant, and the court which decided that case was probably not justified in assuming the power to interpret Sec. 4 of the federal decree as an original proposition, in view of prior decisions of the Supreme Court of Texas. It seems that this was done upon authority of De Arguello v. United States. However, mention is made in the opinion of the Tamaulipas colonization decree and some effect given to the interpretation of the federal decree contained therein. While the reasoning of the court in Cavazos v. Trevino may not be in all respects approved, the ultimate holding was undoubtedly correct.

This view is strengthened by the fact that although the expediente contains several opinions by the Attorney General, in which a number of objections to the proceedings were set out, he raised no contention that the approbation of the federal executive was necessary to the validity of the grant here involved.

Further, in Wood v. Welder, 42 Tex. 396, 408, Judge Gould remarks that in Cavazos v. Trevino the title emanated from the State of Tamaulipas and may possibly be distinguishable from similar titles from the State of Coahuila and Texas. Since the same federal decree No. 72 was involved in both the Coahuila and Texas cases and the Tamaulipas cases, the point of distinction must lie in the difference in legislation of the two states, evidencing a difference of interpretation of the federal decree.

It further appears that there is one recognized exception to the Coahuila and Texas rule as to the necessity of federal approbation of a grant and that is where "a title in the reserved leagues has been issued under the specific authority of a decree of the Congress of the State of Coahuila and Texas." Smith v. Power, 14 Tex. 146. This exception applies to titles granted by a special commissioner of the State of Coahuila and Texas under article 32 of the law of March 26, 1834, providing for the issuance of titles to the inhabitants of the frontier of Nacogdoches and those residing east of Austin's colonies. In Blount v. Webster, 16 Tex. 616, it is held that even if the article involved be considered repugnant to restrictions or exactments of the federal authority, acts thereunder would be recognized as valid by the Texas courts. The clear implication of the holding is that the all important consideration is the action of the State Congress upon the subject, as the judiciary possessed no power to declare that legislation invalid as repugnant to the federal decree. Decree 16, Coahuila-Texas cases are not in point here because the very basis of their holdings—section 7 of the decree —is not here involved. We overrule the State's contention upon this point.

■ The State further contends that the expediente does not disclose the concurrence of the Governor's Council in the proceeding for granting the lands to Nicolas and Juan Jose Balli.

Articles 2 and 3 of the Tamaulipas Colonization Law provide:

"Art. 2. For a foreigner to obtain adjudication of lands he must become domiciliated in some town in the state with a capital of his own to afford him a decent support, or with a trade or useful industrious pursuit which he follows; or he

must establish a new town with one hundred families at least. Should he establish himself on the northern frontier of the state, fifty families shall be sufficient for that purpose.

"Art. 3. In either case they shall make their petitions in writing to the governor of the state, who shall resolve thereon with the concurrence of his council, and audience of the fiscal of the court of justice of the state, making them the concessions of lands that shall be hereinafter determined."

Although these two articles apparently refer to foreigners, their provisions are probably applicable to grants made to Mexicans in view of the provisions of Article 25 of the colonization act wherein it is implied that grants under the law are to be made to Mexican citizens, by the statement that for the occupation of vacant lands, "those born in the republic * * * shall be preferred to foreigners * * *."

Assuming that the concurrence of the council was necessary to the validity of the grant here involved, we are of the opinion that the concurrence of that body was evidenced by its report to the Governor which is contained in the expediente, and heretofore set out. The Council did raise an objection to the record presented to it and called for a correction. The council, however, permitted the "remaining requirements of the law to be taken." The defect pointed out was cured and a testimonio ordered issued. This seems to have been in accordance with the procedure contemplated by the council. We hold that the expediente discloses the concurrence of the council in substantial compliance with Sec. 3 of the Tamaulipas Colonization Act.

■ The State also contends that the Tamaulipas grant to Nicolas and Juan Jose Balli was not in accordance with the Colonization Law of Tamaulipas because the expediente on its face shows an excessive grant. This contention is based upon Article 25 of the Tamaulipas Colonization Law which reads as follows: "The executive shall convoke those born in the Republic for the occupation of vacant lands, who shall be preferred to foreigners in the order of the older date of the designations, and, in case of equality,

the natives or inhabitants of the place to which the land designated belongs, shall have the first place, those of places within the state the second, and those of the other states of this republic the third, and adjudication may be made up to the amount of one hundred and twenty-five million square varas (five leagues)." [4]

The official survey of the island showed an area of 11.15 leagues. There were two grantees, so the supposed excess amounted to 1.15 leagues. However, Article 31 of the Colonization Law provided that: "More than two grants cannot be adjudicated to one individual, and this, should the increased number of his herds or flocks demand it of necessity. For any violation in these cases the state shall recover the ownership thereof."

It seems therefore that the power of the executive extended to the making of two grants of five leagues each to one individual. A total of 20 leagues could legally be made to two individuals.

■ It appears also from the denuncio that Nicolas Balli asserted a claim under the ancient or Spanish jurisdiction. As to such claims the Tamaulipas colonization law provided: "Art. 26. Designators of lands, which, in time of the ancient government did not perfect their adjudication, shall present themselves to the respective authority to continue its course according to the state thereof, effecting the same within the term of forty days from the date of the publication of this law, and on the contrary said lands shall be considered open to designation as vacant."

Under the Spanish authority by the nature of its governmental structure there was no limitation upon the extent of the grant the sovereign might make. The vacant domain was the king's special prerogative. Sheldon v. Milmo, 90 Tex. 1, 21, 36 S.W. 413, 419; Goode v. McQueen's Heirs, 3 Tex. 241, 254. See also Act of February 10, 1852 (3 Gammel's Laws 941, 947), whereby the Legislature confirmed title to the San Juan de Caricitas, a Spanish grant situted in Cameron County, said to contain one hundred and six and a half leagues.

The Governor may have accepted the

---

[4] The federal area limitation for one individual is contained in Decree 72, which provides that: "Art. 12.—In the possession of no individual shall be allowed to be united, as his own property, more than one square league of 5000 yards of lands fit for irrigation, 4 of arable land not irrigated, and 6 of pasture land (a total of eleven leagues)."

statements as to the Spanish claim of Nicolas Balli as true and proceeded accordingly. Indications are that such possession as was had of the island, despite the incursions of hostile Indians, under the Spanish authority and up to the filing of the denuncio, was that of Nicolas Balli.

The exact date of the publication of the Tamaulipas colonization decree is not shown by the record. It is inferable that the denuncio shown in the expediente was filed after the forty-day period mentioned in Article 26 of the decree. Here again a question of interpretation is presented. It seems that no other person had filed an application for a grant to the island or any part thereof prior to the time of the filing of the denuncio on behalf of Padre Balli. Did Article 26 of the decree absolutely bar Padre Balli's Spanish claim, or were his rights thereunder subject to being barred or subordinated to claims of those who might apply for a grant of the island as part of the public domain, after the expiration of the forty-day period but before the assertion of his Spanish claim? Was the forty-day limitation period intended as a directory provision for the guidance of the executive, or did it have the effect of forfeiting the Spanish claim, so to speak, by a refusal to recognize it after the specified period of time had expired?

While the expediente does not disclose the exact views of the Tamaulipas authorities upon the matters of interpretation presented by either Article 26 or Article 31 of the Colonization Law, it is apparent that they (the Governor, the members of the council and the fiscal) did not regard a grant to two individuals in excess of ten leagues as being contrary to law.

■ We think the rule that officers of former governments must be presumed to have acted within the scope of their powers unless the contrary be shown, has application here. Jones v. Garza, 11 Tex. 186; Jones v. Muisbach, 26 Tex. 235.

■ We are aware of the fact that the expediente does not show a final certificate of the Governor of Tamaulipas,[5] but we do have the order of the Governor directing

---

[5] It is unnecessary to a disposition of the particular phase of the case before us to make an affirmative holding that a final certificate was actually issued by the Governor of Tamaulipas. We have disposed of the State's specific contentions wherein it is asserted that the grant was illegal or unauthorized, but there seemingly remains a general contention that because the record fails to show that a final certificate was issued prior to December 19, 1836, there must have been some legal impediment to its issuance. This contention must be rejected as it seemingly appears from the reports of those cases in which the final certificate of the Governor of Tamaulipas was rejected because issued after December 19, 1836, the equitable title was recognized by the Supreme Court, although a considerable period of time had elapsed since the date of the last proceeding disclosed by the particular expediente and the application for the final certificate. Kenedy Pasture Company v. State, 111 Tex. 200, 231 S.W. 683, 691; State v. Bustamente, 47 Tex. 320. It is stated in State v. Sais, 47 Tex. 307, 316, that "We have been referred to no law of limitations within which the party was required to follow up his proceedings to obtain a formal and final concession and delivery of possession." We know of no case holding that the fact that there was a delay of six or seven years in procuring the final certificate raised a presumption that no final certificate issued because of some legal impediment. In this case there are some circumstances indicating that a final title may have been actually issued. Although protocolization of the expediente at the State capital at the time of the issuance of the final certificate seems to be the procedure recommended by the fiscal, as disclosed by one of his opinions contained in the expediente, the final order of the Matamoros Alcalde provides for protocolization in Matamoros, and seemingly contemplates issuance of a final title upon a testimonio or some official certificate. That this form of procedure was sometimes followed is shown by the report of State v. Bustamente, 47 Tex. 320. If it were followed the protocol of the final certificate would have been filed in the archives of Victoria which were destroyed by the French troops in 1864. Kenedy Pasture Co. v. State, 111 Tex. 200, 230, 231 S.W. 683, 693. Documentary evidence of the existence of the final certificate in the form of a testimonio or otherwise may have been destroyed in the wreck of the steamer Anson, near the Brazos Santiago, in November 1850, in which all the papers and original titles connected with claims to lands in Cameron County and presented to Commissioners Miller and Bourland were lost. Miller and Bourland Report; Act of Feb. 10, 1852, Sec. 3; 3 Gammel's Laws 949.

the Alcalde to proceed with the act of juridical possession in accordance with the opinion of the fiscal, who had previously stated that "it remains now only to deposit" the purchase price. The purchase price was paid; all requirements suggested by the Governor, the council and the fiscal were met. Their official actions are not shown to have been contrary to law. Upon the record we are safe in saying that had there been no change in sovereignty a final certificate would have been issued by the Governor of Tamaulipas. The title was good in equity and consequently must be recognized under the terms of the Treaty of Guadalupe Hidalgo. Haynes v. State, 100 Tex. 426, 100 S.W. 912; State v. Gallardo, 106 Tex. 274, 166 S.W. 369; Kenedy Pasture Co. v. State, 111 Tex. 200, 231 S.W. 683.

The State does assert that the evidence was insufficient to show that appellees' predecessors in title at the date of the promulgation of the treaty were citizens of Mexico. We presume the trial court found that they were, and the evidence supports that finding. Further, no Texas case has been cited, and we feel confident that none can be found, wherein a title good in equity against the Mexican Government has been disturbed because of the fact that the owner of that title at the date of the promulgation of the Treaty of Guadalupe Hidalgo was not a citizen of Mexico. In State v. Gallardo, supra [106 Tex. 274, 166 S.W. 373], the Supreme Court regarded as established in this State the rule "that a title to lands within the original Mexican state of Tamaulipas and the present boundaries of Texas, that was good as against the Mexican government on December 19, 1836, * * * is within the protection of the treaty and entitled to

recognition in the courts." We know of no action taken by the Republic or State of Texas or the United States of America in connection with the transfer of sovereignty from Mexican to Texan and American jurisdiction which could be construed as being contrary to the general rule of international law that a change in sovereignty does not affect vested property rights, but, on the contrary, the United States, as evidenced by the treaty, and the State of Texas, as evidenced by various actions of its governmental departments, have always acted in accordance with the principle stated, insofar as legitimate claims founded in good faith are concerned.

Appellant's points Nos. III to VII, inclusive, fail to disclose reversible error and are accordingly overruled.

### Title Under The Act of February 10, 1852.

Chief Justice Willie in Clark v. Hills, 67 Tex. 141, 145, 2 S.W. 356, 358, in speaking of the effect of the Relinquishment Act of February 11, 1858, used language which appropriately describes the object or effect of the Act of February 10, 1852, when he said: "The clear object of the statute was to recognize the validity of the Mexican grant, and to pass all the title of the state as effectually as if it were making a grant de novo; and it confirmed, proprio vigore, the right and title of the grantee to the extent of the boundaries set forth in his title papers."

Appellees need not rely upon the Relinquishment Act if their title be good under the Treaty of Guadalupe Hidalgo. We have held that the title is protected by the treaty, but if we be mistaken in this, then it is apparent that the Relinquishment Act cured all defects in the attempted

Miller and Bourland reported that Padre Island had been "originally granted by the Spanish Government to one Nicolas Balli and subsequently confirmed to him and his nephew, Juan Jose Balli by the Mexican Authorities." The report also recites that they (the Ballis) "obtained a title from the proper authorities." It seems that the Commissioners regarded the title as "perfect" (except insofar as area was concerned) as distinguished from "perfectable," and they may have reached this conclusion upon the basis of evidence in documentary form subsequently lost with the *Anson*, which was not thereafter duplicated.

There is evidence in the record relating to a certain legal proceeding before one of the Matamoros Alcaldes which indicates that no final certificate to Padre Island was issued up to March 17, 1830.

In view of this evidence, the indicated possession of Juan Jose Balli and those holding under him and Nicolas Balli during the years 1830 to 1836, and the trial court's judgment, we could hardly make an *affirmative finding* that no final title issued between March 17, 1830, and December 19, 1839, for the purpose of basing thereon an assumption (unwarranted under the decision of State v. Sais) that there was some legal impediment to the issuance of the final certificate.

grant of the Island by the Tamaulipas authorities, declared the title to be in all things valid, and relinquished all claims of the State thereto, provided the Act applied to Padre Island, and also provided appellees are entitled to the benefits of the Act. The State does not contend that the effect of the Relinquishment Act is different from that above stated. It does contend that the Act does not apply to Padre Island.

This contention we overrule. The Act provides: "That the State of Texas hereby relinquishes all her right and interest in the following described lands to the original grantee thereof, their heirs and legal assigns, to-wit: * * * Cameron County * * * (12) Nicolas Balli and Juan Jose Balli eleven and a half leagues called 'Padre Island'."

Section 5 of the Act contained the proviso: "Provided that nothing in this Act shall be so construed as to relinquish the rights of the State to any of the Islands or salt lakes situated in the territory embraced in this Act."

As applicable here (since no title or claim under the Republic is involved), Section 5 apparently has reference to the Act of Congress of the Republic adopting the common law as the rule of decision which contains an exception to the repealing clause as to "such Laws as relate to the reservation of Islands and Lands, and also of Salt-Lakes, Licks and Salt-Springs, Mine and Minerals of every description; made by the General and State Governments."

It was pointed out in State v. Delesdenier, 7 Tex. 76, 107, 108, that "no such laws [of Mexican origin relating to the reservation of islands] are known to exist."

However that may be, we can not accept a construction of the Act which would attribute to the Legislature an intention to nullify that part of Section 1 of the Act which specifically refers to "Padre Island."

■ It is a cardinal rule of statutory construction that parts of a legislative enactment should be construed together so as to give effect to all parts thereof where such construction is possible under the wording employed in the Act. The provisions of Section 1, relating to Padre Island are specific, while those of Section

5 are general. Erwin v. Blanks, 60 Tex. 583; Shock v. Colorado County, 52 Tex. Civ.App. 473, 115 S.W. 61. It seems clear that the Legislature intended to confirm the title to Padre Island. Lufkin v. City of Galveston, 63 Tex. 437.

. The State further contends that appellees are not entitled to the benefit of the Act. This contention is predicated upon Article XIV, Sec. 8 of the Constitution of 1876.

Section 2 of the Relinquishment Act provides: "That it shall be the duty of those claiming any of the lands named in this act, to have the same surveyed by the District or County Surveyor of the County in which the same may be situated, and upon the return of the field notes thereof to the General Land Office, the Commissioner is hereby authorized and required to have the same platted on the maps of his office, and issue patents for the same in accordance with existing laws; provided, that no patent shall issue for a less amount than the original grant. * * *"

■ Neither appellees nor their predecessors in title ever filed field-notes of the island in the General Land Office. However, it is well settled that under the above provisions of the Relinquishment Act, the failure to have a survey made, field-notes prepared and filed in the General Land Office, and a patent issued, does not limit or impair the confirmation of the title effected by the Act. Clark v. Hills, 67 Tex. 141, 2 S.W. 356; Corrigan v. State, 42 Tex.Civ.App. 171, 94 S.W. 95, holdings expressly approved by the Supreme Court upon refusal of application for writ of error, 94 S.W. 101.

In its brief the State says: "It is true that the Legislature in 1852 did not provide a penalty of forfeiture for failure to make a survey and return field notes * * * but it is equally true that the constitutional framers in 1876 did regard the making of a survey and the return of field notes to be of sufficient importance to justify a forfeiture for failure to comply with respect to land lying between the Nueces and Rio Grande Rivers, and hence in Sec. 8 of Article XIV it was provided that the penalty for failing in the duty prescribed in the 1852 Act should result in the claimant being forever barred."[6]

---

[6] "Persons residing between the Nueces river and the Rio Grande, and owning grants for lands which emanated from the Government of Spain, or that of Mexico which grants have been recognized and validated by the State by acts

As supporting this contention the State relies upon New York & Texas Land Company v. Thomson, 83 Tex. 169, 17 S.W. 920, in which Article XIV, Sec. 2, of 1876 Constitution, Vernon's Ann.St., was involved. This section deals with unsatisfied and unlocated land certificates. "A land certificate is merely the obligation of the government entitling the owner of it to secure the designated quantity of land by following the requirements of the law." New York & Texas Land Company v. Thomson, 83 Tex. 169, 180, 17 S.W. 920, 923. It is at most an incipient title and far different in nature to that acquired under and by virtue of the Relinquishment Act of 1852. The effect of this Act was "to recognize the validity of the Mexican grant," and render the "title perfect as against the state." Clark v. Hills, 67 Tex. 141, 2 S.W. 356, 358.

We are unwilling to attribute to the framers of the present Constitution an intention to provide for a forfeiture of a title which had been regarded as "perfect as against the state" for some twenty-three years prior to the date the Constitution became effective.

There is a vast difference between reviving an inchoate right which theretofore was unenforcible and setting a definite period of time within which it may be enforced, as was done in Article XIV, Section 2, of the Constitution, and providing for the forfeiture of a vested title.

It seems fairly obvious that a proper construction of Article XIV, Section 8, of the Constitution is that claimants whose grants have been recognized and validated by the State through legislative action are allowed to file field notes etc.,

in the General Land Office and there secure a patent up and until January 1, 1880. Thereafter said claimants would be forever barred from completing their surveys, filing field notes, etc., and securing a patent. Under this construction the provision could be regarded as constitutional and valid. It was to the State's advantage to have on file proper plats and records of surveys in its General Land office in order that it might administer and dispose of the public domain in an orderly fashion. The State could encourage this by providing that if such were not done, the right to the issuance of a patent, generally regarded as the highest evidence of title, should be barred.

In our opinion, the adoption of the construction of Article XIV, Section 8, of the Texas Constitution which is here urged by the State would raise a grave constitutional question as to its validity in view of certain provisions of the Constitution of the United States. See Gonzales v. Ross, 120 U.S. 605, 7 S.Ct. 705, 30 L.Ed. 801; Texas-Mexican Railway Co. v. Locke, 74 Tex. 370, 12 S.W. 80.[7]

Appellant's points Nos. I and II are overruled.

### The Extent of The Grant

Having held that a valid grant of land was made to Nicolas and Juan Jose Balli by the State of Tamaulipas, which was in all things confirmed by the Legislature of the State of Texas, questions relating to the extent or area of the grant remain to be determined. The evidence presents a rather peculiar fact situation.

In the application for a grant made by the attorney in fact for Nicolas Balli the

---

of the Legislature, approved February 10th, 1852, August 15th, 1870, and other acts, and who have been prevented from complying with the requirements of said acts by the unsettled condition of the country, shall be allowed until the first day of January, 1880, to complete their surveys, and the plots thereof, and to return their field notes to the General Land Office; and all claimants failing to do so shall be forever barred; provided, nothing in this section shall be so construed as to validate any titles not already valid, or to interfere with the rights of third persons." (Art. XIV; Sec. 8 of Constitution.)

[7] It seems clear that if the title to Padre Island be protected by the Treaty of Guadalupe Hidalgo (and we have

held that it is) Article XIV, Section 8, of the Texas Constitution could not be given effect as attaching a condition of forfeiture to the grant, even if appellant's construction of the Texas constitutional provision be accepted. The second paragraph of Article VI of the Constitution of the United States provides that: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

island is described as containing 19½ leagues. De la Fuente calculated the area at 11.15 leagues in 1829. In 1851, twenty-two years later, Bourland and Miller reported to the Legislature of Texas that the island contained a little more than 30 leagues. In 1941 Boyles surveyed an area of about thirty and one-half leagues.

It seems that either the de la Fuente survey (if considered as an attempt at measurement of the superficial area of the island) or the Bourland and Miller estimate is grossly in error. If we assume that the area of the island increased from 11.15 leagues in 1829 to over thirty leagues in 1941 by accretion, then the proper disposition of the matter would depend upon the determination of the question of ownership thereto as between the appellees as owners of the upland and the State as sovereign. This matter we will hereinafter discuss.

### Assertion that Grant is Limited to 11½ Leagues.

We first discuss the question from the standpoint of an assumption that there was in fact a substantial excess over 11.15 leagues in the island about the year 1829.

As between the two assumptions, on the basis of the evidence, there is little to choose. The probability is that there was an excess and that there also were accretions. The writer is rather inclined to credit the Bourland and Miller estimate, especially in view of the fact that the de la Fuente survey was apparently made for the purpose of estimating the amount of pasture land in the island, for which the State of Tamaulipas should be paid, rather than for the purpose of outlining the boundaries of the island which was entirely surrounded by water. De la Fuente did not atempt to survey the Laguna Madre shore line. He completed his survey in eight days. Boyles in 1941 took three months. This rather indicates that the survey was an estimate upon which the amount of the purchase price could be determined, and was so accepted by the Tamaulipas authorities at Victoria. Considering the date of the grant and the nature of the lands, it is doubtful if the State would have charged or the Ballis would have paid 40 pesos per league for mud flats extending into the Laguna Madre. Boyles' testimony rather indicates that the lands fit for pasturage today are included within the demonstrative plan of de la

Fuente. Some nature of the physical and geographical setting of the island with reference to the sea is disclosed by Boyles' estimate that the difference in areas enclosed by two contour lines around the island about high water mark, varying one-tenth of a foot in elevation would amount to about 5000 acres. This difference would lie in the mud flats on the Laguna Madre side of the island.

However, the fact that the de la Fuente survey did not in fact include the entire superficial area of the island (if this be assumed) did not render all proceedings had with reference to the grant null and ineffective. The most that could be said is that the State of Tamaulipas may have had a right to recover the excess, or demand payment of the stipulated sum per league for the excess. Upon the record here, we can not presume fraud upon the part of either Nicolas or Juan Jose Balli, in connection with the actions of the legally appointed State surveyor which would entirely vitiate all of their claims to the island.

If a right to recover an excess or demand payment of an additional sum as purchase money did exist in the State of Tamaulipas, it was not asserted by that State prior to December 19, 1836. These rights which we assume to exist thereupon passed to the Republic and thence to the State of Texas. The jurisdiction of the Republic and State of Texas over the territory from the Nueces to the Rio Grande, formerly a part of the State of Tamaulipas, was not, however, made physically effective until after occupation of the territory by the United States armed forces during the war with Mexico. When that war was concluded by the treaty of Guadalupe Hidalgo and the Rio Grande boundary recognized by the Republic of Mexico, the State of Texas was vested with actual political jurisdiction over numerous persons, formerly citizens of Mexico, possessed of considerable lands and property rights, many of which had their inception prior to the time of the American Revolution. There naturally existed among those formerly subject to the Mexican jurisdiction a feeling of anxiety, suspicion, if not despair as a familiar sovereignty vanished and the time came for the imposition of a strange, new and radically different sovereignty emanating from the North. This is disclosed by the report of Commissioners Bourland and Miller, dated

November 11, 1851, wherein they state "that they had to encounter much opposition and embarrassment, growing out of an impression which seemed to prevail in the Valley of the Rio Grande, that the Act under which the Board was held, was devised to destroy, rather than to protect their rights (if honestly acquired) to their lands."

By an Act approved on February 8, 1850, the Legislature of Texas provided for the appointment of a commission to investigate land titles in that portion of Texas which had been formerly a part of the Mexican State of Tamaulipas and ascertain the grants by the former sovereign entitled to recognition by the State. The purpose of this Act is well stated by the Commissioners Bourland and Miller in their report of November 11, 1851, as follows: " * * * this Act had its origin in a sincere desire on the part of the Legislature, to protect a class of citizens, but recently brought into, and identified with the State, and who were little accustomed to our laws, usages and customs from the harassing vexations of tedious and expensive lawsuits."

As to Padre Island the Commissioners made the following recommendation: "Nicolas Grisanti and Jose Maria Tobar apply for 11½ leagues of pasture land called 'Padre Island' originally granted by the Spanish government to one Nicolas Balli and subsequently confirmed to him and his nephew Juan Jose Balli by the Mexican authorities. Witnesses prove the occupation of the said tract of land by said original grantee and his nephew for the last 50 years; and that they kept thereon the requisite number of stock to entitle them to the grant of 11½ leagues, never having any adverse claimants etc. They having obtained a title from the proper authorities and resided upon the land peaceably for a number of years; we recommend for confirmation 11½ leagues only to the heirs or assigns of original grantee, for we feel confident that the Island called 'Padre Island' contained or embraces over 30 leagues of land. It is therefore to be understood that we recommend only 11½ leagues of said Island."

The report also contains this statement: "They (the commissioners) have recommended no claim for confirmation, which they do not honestly believe ought to be confirmed. If they have erred at all, they believe they have done so, in holding the claim only to a too strict and rigid compliance with the requirements of the law. They are satisfied that they have not erred in releasing them."

The Bourland and Miller report was examined by a select joint committee of the House and Senate, the members of which decided for themselves the following questions: "Was there an original grant or title founded in good faith? Was it perfect, and if so, were its conditions subsequently complied with? If imperfect, was it perfectable? Has the party claiming, continued to possess the same, except when forced to abandon for good cause (such as incursion of Indians, etc.)? Did the applicant erect fixed improvements, such as houses or jacals, fences, etc.?" The committee adopted the statutory definition of a perfectable title as being one "which would have been perfected under the laws, usages and customs of the government under which they originated, had its sovereignty over the same not passed to and been vested in the Republic of Texas." (Act of February 8, 1850.)

The committee evidently found that the title to Padre Island to be perfect or perfectable, for it stated that "where the committee have been able to decide each of these questions affirmatively, they have reported the claim favorably. Therefore, bearing in mind the law of the 8th of February, 1850, constituting said board; endeavoring to carry it into effect in letter and spirit, believing moreover that the State will be doing sheer justice to thousands of her citizens around whom, heretofore, she has been unable to cast the arm of protection, we report the accompanying bill to confirm certain titles therein set forth, and urgently recommend its passage."

The Legislature adopted the bill as recommended by the committee. The policy of the Act was evidenced by the provision that "no patent shall issue for a less amount than the original grant."

The supposed excess in the Padre Island grant was called to the attention of the Legislature by Bourland and Miller. The joint Legislative Committee, however, recommended not that title to 11.15 leagues out of Padre Island be confirmed, but that the confirmation extend to the entire grant. The Legislature so passed the bill. Its effect was to confirm "the right and title of the grantee, to the extent of the boundaries *set forth in his title papers*." Clark v. Hills, 67 Tex. 141, 145, 2 S.W. 356, 358.

The title papers from the denuncio to the record of the act of juridical possession demonstrate conclusively that the grant extended to an entire island bounded by "Braso de Santiago, Braso de Corpus Christi, Laguna Madre, and the sea."

From and after the passage of the Relinquishment Act, no title, or right to recover an excess of over 11.15 leagues (or 11½ leagues), or right to recover an additional sum as and for purchase price, remained in the State. [8]

### Ownership of Accretions.

We next consider the matter of accretions. The appellant's position may be stated as follows:

The State by its petition made out a prima facie case for recovery of the island. Under the law of Tamaulipas as it existed in 1829, the time of the grant, accretions by the sea became the property of the sovereign. No one knows the extent of the accretion with any certainty. The only definite proof as to the area of the island at the time of the grant is the de la Fuente survey. As to lands now forming part of the island but lying outside this survey, the State should recover as no rebuttal was made to its prima facie title as to such lands.

The ancient civil law of Spain as stated in Las Siete Partidas, completed in the year 1263, was apparently in force in Tamaulipas during the years 1828-29. This seems to be conceded by all parties. This code provides: "For this reason we decree that everything that rivers take from men little by little so that the amount of it can not be ascertained because it is not all removed at once shall belong to the owners of the land to which it is united." Law 26 of Title 28, Partida 3.

This provision comes from Justinian's Institutes wherein the following appears: "Moreover the alluvial soil added by the river to your lands becomes yours by the law of nations. Alluvion is an imperceptible increase; and that is added by alluvion which is added so gradually that no one person can perceive how much is added at any moment of time." Book 2, Title 1, § 20, Justinian's Institutes.

There is room for interpretation of the provisions of the codes above mentioned. Are these sections to be "taken as an example illustrating a general principle" or are they applicable to river accretions only?

"The Spanish commentators do not help us, as they go little beyond a naked statement one way or the other." [9]

---

[8] The designation of leagues contained in the Act of 1852 as applicable to a particular grant named therein has never been construed as meaning a certain area *out of* a particular grant. It is descriptive only. For instance, the Act contains these descriptions: "Nicolas Balli and Juan Jose Balli, eleven and a half leagues, called 'Padre Island'," and "Antonio Rivas, twenty-five leagues, called 'The Rivas Grant'."

In State v. Indio Cattle Company, Tex. Civ.App., 154 S.W.2d 308, this Court held that the Rivas Grant was not limited to twenty-five leagues, the area stated in the Act, but held that the grant which was Spanish in origin included some thirty-six leagues. Cases involving resurveys containing an area actually *in* excess of the original Spanish or Mexican grant are not in point here.

[9] Appellees cite among others:

"The alluvian that the sea adds to the properties situated on its shores, belongs also by the right of accession to the owners of said properties, who are authorized to construct dykes in order to preserve it." Dr. Joaquin Escriche, Dictionary of Laws and Jurisprudence.

"Do lands bounded by the sea enjoy the right of alluvion? * * * Under our ancient law it appears that the doubt must be resolved in favor of those owners whose lands were bounded by the sea." Amandi, Vol. 2, p. 95.

"According to the Roman Law, acquisition of ownership by casting up of soil is either immediate or mediate. It is immediate when silt accumulates against a man's land (alluvion), or when the bed of a stream is left dry. Accumulation of silt or alluvion was also understood to take place when the river or sea added something imperceptibly to the land; and what was so added belonged to the owners of the land where the alluvion occurred, each in proportion to the breadth of his land at the place." Hugo Grotius, Jurisprudence of Holland, Book 2, ch. 9.

"Lands gained from the sea or river, either by alluvion from washing up sand and earth or water gradually and imperceptibly receding, accrue by natural accession to the owner of the estate which receives the addition." Lord Mackenzie's Roman Law, p. 177.

The State primarily relies upon the modern Civil Law Codes. The Code Napoleon, after providing that alluvion deposited by rivers and other streams belong to the riparian owner states:

The State relies upon Ker & Co. v. Couden, 223 U.S. 268, 32 S.Ct. 284, 56 L.Ed. 432, in which the opinion was written by Mr. Justice Holmes, an acknowledged authority in the field of Civil Law. The quotations above set out are taken from this opinion.

The case arose in the Philippine Islands and involved the title to the Cavite Naval Base, now unfortunately in the hands of the enemies of the United States. The Supreme Court of the United States held that title to the naval base was in the sovereign as the owner of the seashore accretions. As we analyze the case, this conclusion is based upon three considerations, namely, (1) the point involved was a matter of local law and therefore deference was paid to the decision of the lower courts of the Philippine Islands; (2) there was an actual appropriation of the lands by the sovereign, as "for a long time the property was used by the Spanish Navy," and (3) the Spanish Law of Waters, dated 1866, which became effective in the Philippine Islands in September, 1871, was construed as expressing "the understanding of the codifiers as to what the earlier law had been."

In the present case we have no authoritative declaration of any governmental department of the State of Tamaulipas upon the point, unless some indication of the attitude of the executive relative thereto may be drawn from the proceedings set out in the expediente. As above pointed out, de la Fuente's survey on its face does not purport to delineate the coast line. It seems that had the State officials been of the opinion that the *then* shore line would be the line of demarcation between the upland and the lands thereafter formed which would belong to the sovereign, a different type of survey would have been necessary and consequently ordered.

No attempt was ever made by either the State of Tamaulipas or the State of Texas to appropriate or occupy any part of the accretions to the island. This indicates that the right either did not exist or was deemed to be of no value.

This leaves only the argument by analogy that the Spanish Law of Waters embraced a declaration of a prior understanding of the law as it existed in Tamaulipas in 1829. This view we might accept if buttressed by appropriate local conditions or acts of local officials indicating a compliance therewith. Absent these the argument must be rejected.

The possibility of beneficial use of the accretions of the island in 1829 appears to have been with the owner of the upland and not the sovereign. We are concerned here essentially with the Spanish law as applicable to an empire controlled by the Spanish crown by right of discovery and conquest, embracing thousands of miles of shore line. At the time of the early Spanish grants to lands bordering on the sea, what would be the advantage to the sovereign of the ownership of accretions along the shore line? Or at a later date, 1829, what advantage or use to the State of Tamaulipas would result from its ownership of the mud flats in the Laguna Madre formed by the accretions to Padre Island?

The obscurity of the Partidas, the lack of a specific provision therein relating to the matter, the lack of agreement among the Civil Law writers, all indicate that at the time of the early development of the Civil Law, the question was largely academic insofar as the sovereign was concerned. The theory of ownership of accretions by the sovereign was a creature of a later date, which came into being along with the commercial, business and maritime development of the Civil Law countries and was finally crystallized in the Code Napoleon in 1804. Conditions prevailing in France at this date were obviously different from those existing in the Spanish province of New Santander (later the State of Tamaulipas). We hold that the law in force in Tamaulipas in 1829 did not provide for sovereign ownership of accretions, but that, on the contrary, ownership thereof belonged to the owner of the upland.[10]

"This right does not take place with regard to derelictions of the sea." Book II, Sec. 1, Arts. 556, 557.

[10] In Ker & Co. v. Couden, supra, the date of the Spanish grant of the upland is not specifically stated. It is stated that the land involved "has been formed gradually by action of the sea; all of it since 1811, about three quarters since 1856, and a part since 1871." The argument that the Spanish Law of Waters expresses the understanding of the codifiers as to what the earlier law had been is obviously much stronger in force when made applicable to the law as it may have existed in 1856, for instance, than it is when applied to the law as it may have existed in 1811, or some earli-

### The Location of the Boundaries of the Grant

As heretofore stated, the State described the island by field notes prepared by J. S. Boyles. The survey was based upon what Boyles considered the line of mean high tide. The judgment of the court was to the effect that the State had no interest in and to the lands enclosed by Boyles' survey. Although no survey was made of a line purporting to be the line of high winter tide, the State contends that the grant is limited by this line under the civil law in force in Tamaulipas at the time of the grant, and consequently the State should have judgment for that land lying between the line of winter high tide and mean tide.[11] Appellees counter with the proposition that

er date. This suggests that as grants of the nature here discussed both under the common law and civil law extend to sea, De Meritt v. Robison, 102 Tex. 358, 361, 116 S.W. 796, 797, the rights of the holders thereof extend to and are subject to the sovereign's definition of the seashore as a part of the sea, as well as the sovereign's declaration of its rights appertaining thereto. This statement must of course be considered in connection with and consequently limited by the constitutional inhibitions or restraints upon governmental agencies. The inference of the argument set forth in the opinion in Ker & Co. v. Couden which we gather from the dates set forth, is that the Spanish authority in the Philippines could have reserved accretions to accrue in the future to the seashore, a part of the sea over which the sovereign had dominion. In Texas the right to accretions which might accrue in the future (insofar as rivers are concerned) is seemingly regarded as a vested right protected by constitutional and treaty provisions. Manry v. Robison, 122 Tex. 213, 227, 56 S.W.2d 438, 445. Probably there were no such restrictions affecting the Spanish Legislative authority in the Philippine Islands.

As to the provisions of the Spanish Law of Waters, we quote from Ker & Co. v. Couden [223 U.S. 268, 32 S.Ct. 286, 56 L.Ed. 432]: " * * * The Law of Waters of 1866, which became effective in the Philippines in September, 1871, and the validity of which we see no reason to doubt, after declaring, like the Partidas, that the shores (playas), or spaces alternately covered and uncovered by the sea, are part of the national domain and for public use (arts. 1, 3), goes on thus: 'Art. 4. The lands added to the shores by the accessions and accretions caused by the sea belong to the public domain. When they are not (longer) washed by the waters of the sea, and are not necessary for objects of public utility, nor for the establishment of special industries, nor for the coast guard service, the government shall (will?) declare them property of the adjacent estates, in increase of the same.' "

If we consider a law similar to the provisions of the Spanish Law of Waters to have been in force in Tamaulipas in 1829, what was the effect of the adoption of the common law of decision by the Republic in 1840?

Under the common law, the sea shore extended to mean high tide and accretions belonged to owners of the upland. The grant extended to the sea, and if the adoption of the common law rule of decision be considered as a re-definition of the sea shore and the rights of the sovereign appertaining thereto, it would have the effect of declaring accretions formed from 1829 to 1840 the property of the adjacent owners and relinquishing the rights of the sovereign to future accretions. It should be noted that in the Act of 1840, the exception in the repealing clause insofar as land grants are concerned is limited to "such laws as relate exclusively to grants and the colonization of lands *in the State of Coahuila and Texas.*" Manry v. Robison, 122 Tex. 213, 223, 56 S.W.2d 438, 443. Laws relating to Spanish grants or grants of the State of Tamaulipas are not excepted. 2 Gammel's Laws, 177, 178.

Generally speaking the law, Spanish or Mexican, in existence at the time the grant was made controls. This because the Spanish or Mexican law usually vested some right or title in the individual which is necessarily protected by treaty or constitutional provisions. Manry v. Robison, supra. An act of the Legislature which has the effect of re-defining the sea shore and the rights of the sovereign therein, and does not diminish the estate or rights of the holders of grants along the sea would not come within the inhibitions of either treaties or constitutions.

In State v. Texas Land & Cattle Company, 34 Tex.Civ.App. 460, 78 S.W. 957, page 961, the Austin Court of Civil Appeals held that the accretions to a Spanish grant of 1807 belonged to the owner of the upland. From the citation of authority, Denny v. Cotton, 3 Tex.Civ. App. 634, 22 S.W. 122, it is apparent that the common law rule of decision is the basis of the holding.

[11] While there are Texas cases which

the evidence is sufficient to support a finding that there is no substantial difference in fact between the line of high winter tide and the line actually surveyed by Boyles. This position must be sustained. The difference, if any, is purely theoretical. We are here dealing with an island having a perimeter of 238 miles, the sands that compose that island and the waters of the sea.

According to Boyles, the theoretical difference in elevation between mean high tide for the whole year and mean high tide of the winter months is .09 of a foot. Boyles accepted the average low tide as established by the United States Engineering Department's data. From readings of tide gauges along the Gulf Coast from Galveston to a point near the southern end of Padre Island he calculated that mean high tide was 1.7 feet above mean low tide. By similar calculations he placed the line of high tide for the winter months at 1.79 feet above mean low tide. But it appears that the difference between mean high tide and winter high tide is greater at Galveston, a considerable distance north of the island, than it is in the immediate vicinity of the island. The difference between the elevations disclosed by the southern reading (El Moro) is only .01 of a foot. Further, Boyles testified that there was no normal tide (as distinguished from wind tide) appreciable in the Laguna Madre, and according to Boyles it is on the Laguna Madre side of the island that a slight difference in elevation between two contour lines would make a substantial difference in the areas enclosed within the lines. The particular area which would be within one line and excluded by the other is not lo-

cated, and its area is stated as an estimate or guess by Boyles.

In his testimony relating to a prior survey in the north end of the island made by Blucher, Boyles testified that he found about 500 acres more in the superficial area (in a certain section) than Blucher had surveyed, and that there was room always for a difference of opinion between competent surveyors as to "what line should be run and what area should be included within superficial areas and in the Laguna." Boyles also testified that the line of survey as shown by his field notes did not exactly correspond with every slight indenture or extension of the shore, as such a course of procedure was obviously impractical.

■ From Boyles' testimony as a whole, we have concluded that, considering the methods necessarily employed in laying a line upon the ground, there is no practical difference between the line actually surveyed by Boyles and the line of high winter tide. The trial court's implied finding upon the point must be sustained.

We overrule appellant's points Nos. VIII, IX and X.

There are certain parties who appear here as appellants, in addition to the State of Texas. Their rights are dependent upon a recovery by the State of the lands involved, consequently what has been said also disposes of the case insofar as said appellants are concerned.

No reversible error being disclosed, the judgment of the trial court is in all things affirmed.

---

speak of the general rule of the Civil Law as being applicable to Spanish and Mexican grants, De Meritt v. Robison, 102 Tex. 358, 361, 116 S.W. 796, it seems that there is a substantial difference in wording between Justinian's Institutes and Las Siete Partidas in regard to the matter, viz.:

"It is the shore of the sea as high as the highest winter flood runs up." Justinian's Institutes (Book 2, Title 1, De Divisione Rerum et Qualitate, Sec. 3.)

"* * * All that ground is designated the shore of the sea which is covered with the water of the latter at high tide during the whole year, whether in winter or in summer." (Partida 3, Title 28, Law IV.)

For the relationship of the Partidas to Justinian's Institutes, see State v. Grubstake Investment Association, 117 Tex. 53, 60, 297 S.W. 202, 204.

What was said in the foregoing footnote also has application here.